**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

JOHN DEREK MURPHY
    Petitioner

vs.                                    Case No.05-10548-JLT

Michael A Thompson,
MCI Shirley, Superintendent
    Respondent

**MEMORANDUM OF LAW IN SUPPORT OF
PETITION UNDER 28 U.S.C. §2254
FOR WRIT OF HABEAS CORPUS BY JOHN DEREK MURPHY,
A PERSON IN MASSACHUSETTS STATE CUSTODY**

The Petitioner John Derek Murphy, W68679, (hereinafter

"Murphy") is currently confined at the Massachusetts Correctional

Institute at Shirley, Massachusetts ("MCI Shirley-Medium"). His

indictment and conviction arose in Middlesex County,

Massachusetts. He was sentenced to nine to ten years by a

Massachusetts Superior Court judge on October 19, 2000.

Petitioner Murphy, through counsel, respectfully files this

memorandum in support of his petition pursuant to 28 U.S.C. §

2254 requesting the issuance of a writ of habeas corpus.

**I. INTRODUCTION**

A defendant's right to a fair trial by an impartial jury is

the foundation of the American system of justice. Petitioner

Murphy's 6th Amendment constitutional right to a fair trial was

destroyed when the state court refused to declare a mistrial and

1

dismiss a juror who had an inappropriate and highly prejudicial conversation with another person about Murphy's other similar criminal case during the trial and prior to deliberations.   The fair trial was compromised because the juror withheld the highly relevant information that this other person was both one of his best friends and Murphy's other criminal defense attorney. Murphy submits that this failure to be forthright when questioned by the trial court made the court's subsequent finding of impartiality meaningless. If the juror had truly remained fair and impartial after this conversation he would have fully disclosed who the "other person" was to the court. Because the juror effectively lied to the trial court, Murphy did not receive a fair trial as was his right under the United States Constitution. Under no standard can this be held harmless.

## II. STATEMENT OF THE CASE

On April 23, 1998 the Petitioner John Derek Murphy was charged, in eighteen indictments out of the Middlesex Superior Court, with fourteen counts of larceny over $250 in violation of G.L. c. 266, §30; with one count of fraudulent use of a credit card to obtain money and goods in violation of G.L. c. 266, §37C; with one count of forgery of a record/return or writing in violation of G.L. c. 267, §1; with one count of forgery by uttering a false record/deed or writing in violation of G.L. c. 267, §5; and with one count of falsifying or stealing a driver's

2

license in violation of G.L. c. 90, §24B. (See Docket Sheet attached). In December, 1999 two counts (6 and 13) of larceny over $250 were dismissed at the request of the Commonwealth. (See Docket).

On October 10, 11, 12, 13, 16, 17, and 18, 2000, the remaining sixteen indictments were tried to a jury in the Middlesex Superior Court (Hamlin, J., presiding). The jury returned verdicts of guilty on all sixteen counts. (Transcript Volume VII, pgs.134-144). The court sentenced Murphy to nine to ten years on the forgery indictments (counts 16 and 17); and four and half to five years on the larceny counts to run concurrent with the forgery sentence. (See Transcript Volume VIII). The license falsification charge, count 18 was filed by the court. (See Transcript Volume VIII).

Murphy filed a Notice Of Appeal on October 19, 2000. The case was entered in this Court on May 1, 2001 and an oral argument was held on October 17, 2002. On October 15, 2003 the Appeals Court released an opinion affirming the judgment against Murphy at Commonwealth v. Murphy, 59 Mass.App.Ct. 571 (October 15, 2003). (See Decision attached). On November 18, 2003 the Petitioner sought review of his conviction in the Massachusetts Supreme Judicial Court in an Application for Further Appellate Review (Docket No. FAR-13790). On December 29, 2003, the S.J.C. denied the Application for Further Appellate Review. (See

3

attached).

Murphy now seeks relief from this Court with his Petition.

## III. STATEMENT OF FACTS

The Appeals Court adopted essentially the same facts as set forth by Murphy in his brief and application for further appellate review.[1] The facts set forth below are based on both the Appeals Court decision and transcript evidence from Transcript Volume I, page 103; Transcript Volume V, pages 1-13; Transcript Volume VI, pages 73-75 and 88-111; and Transcript Volume VII, pages 3-10, all attached to this Memorandum.

During jury selection process, one of the jurors indicated that his father-in-law was a former United States Attorney, and that his cousin was a police officer. On the fifth day of trial, this same juror informed the court that, while the trial was ongoing, he spoke with an individual at a social gathering and learned that the defendant had other criminal matters pending in Suffolk Superior Court. 59 Mass.App.Ct. at 579; see also Transcript Volume I, pg. 103; Transcript Volume V, pgs. 4-13. At a hearing on the matter, the juror informed the judge that "*somebody* let out that they knew that the defendant had another criminal proceeding before the court." (Emphasis added). The juror said that he had not spoken to any of the other jurors about the matter, and assured the judge that he could remain fair

_____

4

and impartial. 59 Mass.App.Ct. at 579; Tr.Vol.V:4-13. When asked
by the trial court to relate the exact conversation, the juror
said that "this person", after finding out that the juror was
before Judge Hamlin, said "Oh that's the John Murphy case. He's
got another one too."[2] (Transcript Volume V, pgs.5-7). When asked
by the trial court what that meant, the juror responded:

> Right. So I don't know what that really means. But I assumed
> it meant that he had another -- I think it was reasonable to
> infer that he meant another --I happen to know a lot of law
> enforcement people, unfortunately, and I think it was just
> reasonable to assume that he meant another -- maybe he said,
> 'he's got another case too.' I'm trying to remember the
> exact words.

(Transcript Volume V,pgs.5-7)

When asked again what that meant, the juror said:

> Well, I thought it meant that he had another case, another
> court case too.

(Transcript Volume V, pgs. 5-7).

The juror said there was no further conversation and

insisted that he could remain impartial and fair stating:

> Absolutely. I think it is completely irrelevant to this
> matter at hand. And in this country, you're innocent until
> proven guilty. And it is completely irrelevant as far as I'm
> concerned. And I only mentioned it because I thought the
> defendant was entitled to have, you know, the best, fairest
> hearing possible, which is why I wanted to bring it up to
> everybody's attention. It has no impact on me whatsoever.[3]

(Transcript Volume V, pg. 8).

---

1 The Appeals Court decision footnoted this part of the
conversation between the juror and the trial court. 59 Mass.App.
at 579, Note 9.

2 The Appeals Court decision also footnoted this response from
the juror. See: 59 Mass.App.Ct. at 579, Note 10.

5

While insisting that he could remain fair and impartial, the juror failed to disclose his close relationship with the other attorney, referring to his best friend merely as "somebody". (Tr.Vol.V:5-7).    The Defendant completely relied upon these incomplete representations in deciding not to move to dismiss the juror or for a mistrial at that time. (Transcript Volume V, pgs.10-13). The record makes clear that the reason Murphy's trial counsel did not move for a mistrial earlier was based upon her belief that the juror did not say "other criminal matters" in his testimony. (Transcript Volume VII, pg.9). "The judge found the juror to be credible when he said that he had not talked to any of the other jurors about the matter, found that the juror remained fair and impartial, and permitted him to remain on the jury." 59 Mass. App. Ct. at 579.

After calling Robert Fox ("Attorney Fox"), Murphy's trial counsel in the other case, that same evening, the following day Murphy informed his trial counsel who then informed the court that the person with whom the juror had spoken was Murphy's Suffolk County trial counsel. Transcript Volume VI, pgs.73-75,88-102,105-111; 59 Mass. App. Ct. at 579. After being sworn, Murphy testified that he called Attorney Fox the previous evening, and that during the conversation Attorney Fox inquired as to whether a juror had been excused. (Tr.Vol.VI:97-101,105-110). Murphy stated that Attorney Fox told Murphy that he "ran across a juror"

6

and that he told the juror he was Murphy's criminal attorney on Suffolk Superior Court matters. (Transcript Volume VI, pgs. 107-108; 59 Mass. App. Ct. at 579.)

The trial court ordered Attorney Fox to appear in court and then conducted a further hearing. 59 Mass. App. Ct. at 579. In response to the judge's questions, Fox indicated that the juror was one of his best friends and that he had seen him at synagogue that past weekend. Transcript Volume VII, pg. 3; 59 Mass. App. Ct. at 579. "Fox further advised the judge that prior to this trial, he and the juror had had many discussions about his criminal defense work and the judicial system." 59 Mass. App. Ct. at 579-580. For some inexplicable reason, Fox revealed that he represented Murphy on other criminal matters in the Suffolk Superior Court after the juror told him that he was on a jury before Judge Hamlin. Transcript Volume VII, pg.4; 59 Mass. App. Ct. at 580. On this particular point Fox denied telling Murphy that he told the juror he was Murphy's attorney on similar criminal matters in Suffolk Superior Court, stating that " I don't think I was that direct", however the juror was clear that Fox told him he represented Murphy on other criminal matters. (Tr.Vol.V:3-11; Tr.Vol.VII:6). Fox did admit that his friend knew he was a criminal defense lawyer and that they had "had many discussions about [his] work and the judicial system". Transcript Volume VII, pgs 5-6; 59 Mass. App. Ct. at 580.

Upon receiving this information, Murphy's trial counsel moved for a mistrial and objected to the juror's continued participation in the trial. Transcript Volume VII, pgs. 8-10; 59 Mass. App. Ct. at 580. Because several other jurors had already been let go for other reasons, had this juror been dismissed the judge would have been forced to declare a mistrial because there would have only been eleven jurors remaining. See Docket; Transcript Volume III, pgs. 5-6; Transcript Volume V, pgs. 3-11; Transcript Volume VII, pgs. 8-10). The trial judge made further findings as to the credibility of Fox and the juror, renewed her finding that the juror remained impartial and unbiased, denied the motion for a mistrial, and permitted the juror to remain. Transcript Volume VII, pgs. 8-10; 59 Mass. App. Ct. at 580.

## IV: ARGUMENT

**JOHN DEREK MURPHY'S CONVICTIONS AND SENTENCES ARE CONSTITUTIONALLY INFIRM BECAUSE THEY ARE THE PRODUCT OF SIXTH AND FOURTEENTH AMENDMENT VIOLATIONS OF MURPHY'S DUE PROCESS RIGHTS AS WELL AS HIS RIGHTS TO A FAIR TRIAL BY AN IMPARTIAL JURY.**

### The Standard

The Antiterrorism and Effective Death Penalty Act's (AEDPA) deferential standard as codified in 28 U.S.C. § 2254 (d)(1)-(2) provides:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

(1) resulted in a decision that was contrary to, or

8

>            involved an unreasonable application of, clearly
>            established Federal law, as determined by the Supreme
>            Court of the United States; or
>
>            (2) resulted in a decision that was based on an
>            unreasonable determination of the facts in light of the
>            evidence presented in the State court proceeding.
> 28 U.S.C. § 2254(d).

The issue regarding the juror misconduct was appropriately raised in Murphy's direct appeal and considered by the Appeals Court in Commonwealth v. Murphy, 59 Mass. App. Ct. 571, 579-581 (2003). See Manisy v. Maloney, 283 F. Supp. 2d 307, 319-320 (D.Mass,2003). Although the Massachusetts Appeals Court recognized the Supreme Court's ruling that any private communication or contact either directly or indirectly with a juror during a trial about the matter pending before the jury is deemed presumptively prejudicial, the court did not find the trial court's actions to be clearly erroneous or an abuse of discretion. Commonwealth v. Murphy, 59 Mass. App. Ct. 571, 580-581 (2003), quoting Remmer v. United States, 347 U.S. 227, 229 (1954). The court's basis was that "even though the contact may have given rise to a high probability of prejudice, the trial judge's appropriate hearing, coupled with her detailed findings, satisfies us that, as the trial judge found, this probability did not manifest in any actual prejudice". Commonwealth v. Murphy, 59 Mass. App. Ct. at 581. The Petitioner Murphy submits that under 28 U.S.C. § 2254, this decision is either "an unreasonable determination of the facts in light of the evidence" in violation of clearly established United States Supreme

9

Court precedent or (2) "contrary to" clearly established federal
law.

**A. Given The Specific Facts Of This Case, The State Court's
Finding That There Was No Actual Prejudice Was An Unreasonable
Determination Of the Facts In Violation Of The Supreme Court
Principles Set Forth In Mattox v. United States and Remmer v.
United States.**

Under clearly established constitutional law, the Sixth
Amendment to the United States Constitution, as applied to the
States through the Due Process Clause of the Fourteenth Amendment,
guarantee to the criminally accused the right to a fair trial by an
impartial jury with indifferent jurors. Irvin v. Dowd, 366 U.S.
717, 722 (1961); Jones v. Robbins, 8 Gray 329, 341-342 (1857);
Duncan v. Louisiana, 391 U.S. 145, 149 (1968). In Mattox v. United
States, 146 U.S. 140, 142 (1892) and later in Remmer v. United
States, 347 U.S. 227, 228-229 (1954), the Supreme Court declared
the principle that private communications with jurors and third
persons are forbidden and deemed presumptively prejudicial unless
there is a showing that the contact was harmless. Indeed "[o]ur
system of trial by jury presupposes that the jurors be accorded a
virtual vacuum wherein they are exposed only to those matters which
the presiding judge deems proper for their consideration. This
protection and safeguard must remain inviolate if trial by jury is
to remain a viable aspect of our system of jurisprudence. Any
conduct which gives rise to an appearance of evil must be
scrupulously avoided." Caliendo v. Warden of California Men's

10

Colony, 365 F.3d 691, 696 (9th Cir. 2004), cert. denied Marshall v. Caliendo, 2004 U.S. LEXIS 6733 (U.S., Oct. 12, 2004), quoting United States v. Harry Barfield Co., 359 F.2d 120, 124 (5th Cir. 1966).

The First Circuit has noted that juror misconduct, either through juror bias or improper juror contacts "are at the core of the Sixth Amendment's right to a trial by an impartial jury, free from prejudicial contact. Private communications with a deliberating juror create the concern that the juror may reach a verdict on the basis of the matters communicated, rather than the trial evidence." United States v. Gaston-Brito, 64 F.3d 11, 12 (1995), quoting United States v. Day, 830 F.2d 1099, 1103 (10th Cir. 1987). See also United States v. O'Brien, 972 F.2d 12, 13-15 (1st Cir.1992)(Applying the Remmer/Mattox standard of review); United States v. Angiulo, 897 F.2d 1169, 1184 (1st Cir. 1990).

In this case, although the trial judge conducted a hearing, given the particular actions of the juror in this case and his lies by omission about his true relationship with Murphy's other criminal defense attorney, the trial judge's inquiry was not enough and the Appeals Court's affirmation of what happened was in clear contravention of U.S. Supreme Court precedent.

When a juror lies or gives answers intended to obscure the court's inquiry as happened in Murphy's case, the juror demonstrates presents unacceptable risk of partiality and

11

unfairness. For example, the Second Circuit has held that an impermissible partiality is reflected when a juror intentionally lies or deliberately fails to disclose information. United States v. Colombo, 869 F.2d 149, 151-152 (2nd Cir.1989). In Colombo, the court found that a juror both claimed to know the defendant's location was a "hang out for gangsters" and responded falsely to a material question on voir dire because she wanted to sit on the jury. Id at 152. Similar to the case at bar, it was not the fact that "the juror's relationship with her brother-in-law [a government attorney] tainted the proceedings but that *her willingness to lie about it exhibited an interest strongly suggestion partiality*". Id at 152, emphasis added. In this case, the juror's friendship with Murphy's other defense attorney would have likely been irrelevant had there not been a conversation about Murphy's other similar criminal case and had the juror not blatantly omitted the fact of his friendship during questioning by the trial judge. While the juror behaved appropriately in bringing the fact of the conversation to the court, there is no innocent or logical explanation for his failure to be upfront about his close friendship with the other attorney. Indeed if Murphy had not called Attorney Fox after the hearing with the juror, he could never have know that his own attorney revealed prejudicial information to a juror. Nor would he have known that the juror was "best friends" with the attorney. Contrast United States v. Greer, 285 F.3d 158,

12

167 (2ⁿᵈ Cir.2000)(Court found juror's omissions or misstatements were not made for an illegitimate purpose or with a malicious design but were inadvertent or based upon the belief that he could be impartial). Based upon the testimony of Attorney Fox, it is clear that the juror was well aware of the significance of the conversation and his close ties to Attorney Fox. To say otherwise is to avoid the reality of the situation. Murphy submits that the juror wanted to stay on the jury and he was willing to obstruct the court's inquiry by deliberately omitting the fact of his close friendship and many conversations with Attorney Fox to avoid getting challenged. The trial judge ignored this very serious issue after Attorney Fox's testimony and declined to question the juror further or declare a mistrial. While it may be inappropriate to speculate into the jury deliberations, it is unlikely that the juror remained silent during deliberations about either his conversation with Attorney Fox or his knowledge about Murphy's other similar criminal case in Suffolk County. Daughtry v. Dennehy, 946 F.Supp 1053, 1065 (D.Mass 1996), citing Mahoney v. Vondergritt, 938 F.2d 1490, 1492 (1st Cir. 1991), cert. denied, 502 U.S. 1104, 117 L. Ed. 2d 436, 112 S. Ct. 1195 (1992).

The Colombo court's concern was that "[s]uch an interest not only suggests a view on the merits and/or knowledge of evidentiary facts but is also quite inconsistent with an expectation that a prospective juror will give truthful answers concerning her or his

ability to weigh the evidence fairly and obey the instructions of the court". Id at 151-152. In noting the many other courts in accord with this view [see e.g.: United States v. Bynum, 634 F.2d 768, 771 (4th Cir.1980) ("certainly when possible non-objectivity is secreted and compounded by the deliberate untruthfulness of a potential juror's answer on voir dire, the result is deprivation of the defendant's rights to a fair trial"); McCoy v. Goldston, 652 F.2d 654, 658-659 (6th Cir. 1981)(district court shall presume bias where juror deliberately concealed information); United States v. Perkins, 748 F.2d 1519, 1531-33 (11th Cir.1984)(a juror's refusal to disclose that he knew the defendant gives rise to a presumption of actual bias)], the Colombo court correctly focused on the issue of the juror's "deliberateness" in failing to disclose information. Id.

The juror's deliberate failure to fully disclose his relationship with Murphy's other criminal defense attorney is exactly what is at issue in this case. He was asked specific questions about his conversation with the person he referred to as "somebody". He was given the opportunity to disclose that his conversation was with one of his closest friends. The transcript makes clear that he deliberately chose to omit the truth. Transcript Volume V, pgs. 1-14. Certainly the information was ultimately revealed once the other attorney testified, but it is the juror's motives for concealing information that this Court must

14

look at in determining whether the state court erred in affirming Murphy's conviction under these circumstances. See Jones v. Cooper, 311 F.3d 306, 313 (4th Cir.2002), citing to McDonough Power Equip., Inc. V. Greenwood, 464 U.S. 548, 556 (1984).

However, regardless of the juror's motivation to lie by omission in response to legitimate questions posed by the state trial court, the more serious concern for Murphy is "[i]f a juror treats with contempt the court's admonition to answer . . . questions truthfully, [he] can be expected to treat [his] responsibilities as a juror - to listen to the evidence, not to consider extrinsic facts, to follow the judge's instructions - with equal scorn. Moreover, a juror who tells major lies creates a serious conundrum for the fact-finding process. How can someone who [himself] does not comply with the duty to tell the truth stand in judgment of other people's veracity?" Dyer v. Calderon, 151 F.3d 970,983 (9th Cir.1998). In Dyer the court inferred bias on the part of a juror who lied repeatedly about her background in order to secure a seat on the jury even though the court could find no "actual bias" because the juror's actions created "destructive uncertainties" about her indifference. Id at 982-983. There can be no doubt that Murphy would have reacted differently to the juror's disclosures had the juror immediately stated that the conversation was with Murphy's other defense attorney. This is born out by the fact that he immediately notified his trial counsel the next

15

morning about his conversation with Attorney Fox.

In Green v. White the Ninth Circuit again found that a state court's determination that a juror did not lie was in contradiction to the facts and was therefore clearly erroneous. 232 F.3d 671, 677-678 (9ᵗʰ Cir.2000). Given evidence that a juror lied twice to secure a seat on the jury and engaged in behavior during the trial that brought "his impartiality into serious question", the Ninth Circuit found the state court's treatment regarding the issue of the juror's lies "particularly disturbing". Id at 678, Note 9. In this case it is clear that had Murphy not had a conversation with Attorney Fox the night after the juror testified, the fact of the friendship would never have come to light. Thus, the trial judge's refusal to look further into the juror's motivations for lying and the Appeals Court's affirmation of what occurred is even more disturbing.

The trial judge was not entitled to simply rely on the juror's assurances that they could remain impartial. See Murphy v. Florida, 421 U.S. 794, 800 (1975); Sheppard v. Maxwell, 384 U.S. 333, 351 (1966). "A juror is unlikely readily to admit to a judge that he has violated the express directive of the Court against discussing the case. Indeed, even a juror's good faith belief in his own impartiality is not dispositive." United States v. Shapiro, 669 F.2d 593, 601 (9ᵗʰ Cir.1982), citing Irvin v. Dowd, 366 U.S. at 727-28. As stated in United States v. Gaston-Brito, "it was the .

16

. . court's obligation to develop the relevant facts on the record, not merely presume them." 64 F.3d 11, 13 (1st Cir.1995); accord Dyer v. Calderor, 151 F.3d at 976 ("a judge investigating juror bias must find facts, not make assumptions"). Once the issue was raised by Attorney Fox in his testimony, the trial judge should have conducted a further inquiry with the juror to determine why he omitted the fact of the close friendship. The fact that the judge did not do so and the affirmation of this by the Appeals Court was in direct contravention with established federal constitutional precedent in light of the facts of this case and the evidence presented.

**B. The State Court Decision Was Contrary to United States Supreme Court Precedent Requiring That the Government Bear The Burden Of Proving The Juror Misconduct To Be Harmless In This Case.**

The record establishes and the Appeals Court even agreed that the contact between the juror and Attorney Fox gave "rise to a high probability of prejudice", although the court erroneously determined that the trial court's hearing and findings "satisfied" the court that "this probability did not manifest in any actual prejudice". Commonwealth v. Murphy, 59 Mass. App. Ct. at 581. The Appeals Court's application and analysis of the constitutional issues raised by the juror misconduct was contrary to established federal precedent.

Referred to as the Mattox rule by the Ninth Circuit, when an "unauthorized communication with a juror crosses a low threshold to

17

create the potential for prejudice" or the "risk of influencing the verdict", prejudice is "presumed under these circumstances, and the defendant's motion for a new trial must be granted unless the prosecution can show that there is no reasonable possibility that the communication will influence the verdict." Caliendo v. Warden of California Men's Colony, 365 F.3d at 697, citing United States v. O'Brien, 972 F.2d at 14; United States v. Dutkel, 192 F.3d 893, 899 (9th Cir.1999). Therefore in the instant case, once the juror came forward and informed the trial judge about his conversation with Attorney Fox, the burden shifted to the Commonwealth to show that there was no reasonable possibility of harm to the defendant. Remmer, 347 U.S. at 229; United States v. O'Brien, 972 F.2d at 14. Murphy submits that after the hearing with the juror and once further information came to light regarding the juror's close relationship with Attorney Fox, the presumption of prejudice increased and the Commonwealth should have been required to show that the juror's lies by omission did not harm Murphy and influence the verdict.

The Commonwealth did not satisfy that burden nor did the trial judge or Appeals Court recognize that the Commonwealth bore that burden. Indeed, the language of the Appeals Court decision suggests that the burden remained solely on Murphy stating that "[a] finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that

18

the finding was clearly erroneous". Commonwealth v. Murphy, 59 Mass. App. Ct. at 581, quoting Commonwealth v. Emerson, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000).

A defendant is prejudiced when he is convicted by a jury with even one biased member. United States v. Olano, 507 U.S. 725, 739 (1993). In United States v. Cheek, the Fourth Circuit enumerated the factors the Supreme Court laid out for establishing a presumption of prejudice: "(1) any private communication; (2) any private contact; (3) any tampering; (4) directly or indirectly with a juror during trial; (5) about the matter before the jury." 94 F.3d 136, 141 (1996) (citing Remmer, 347 U.S. at 229. While there are no allegations of jury tampering in this case, Murphy has shown all the other factors that trigger a presumption of prejudice, see Cheek, 94 F.3d 136, 141 (4th Cir. 1996). Especially where the juror deliberately obstructed the court's inquiry by intentionally omitting information regarding the true nature of the extraneous influence that he knew to be relevant, the circumstances dictate that bias must be presumed. Dyer v. Calderon, 151 F.3d at 981, 984 ("Implied bias may indeed be the single oldest rule in the history of judicial review. . . . a rule so deeply embedded in the fabric of due process that everyone takes it for granted."); contrast Amirault v. Fair, 968 F.2d 1404, 1405-06 (1st Cir.1992)(bias not presumed where juror stated she had not been victim of sexual assault because juror had blocked out forty year old memory of childhood rape); see

19

McDonough Power Equip., Inc. V. Greenwood, 464 U.S. at 556 (where juror dishonestly answers voir dire question, court must inquire as to bias).

Once prejudice was presumed, the burden lay "heavily" upon the government to prove that the error was harmless to the defendant. Remmer v. United States, 347 U.S. 229. The Commonwealth simply did not carry that burden. Once Attorney Fox testified that the juror was one of his best friends, and someone with whom he had had many conversations about the criminal justice system, it behooved the Commonwealth to rebut the further presumption of prejudice raised by the juror's lies by omission. The Commonwealth did not seek any further inquiry of the juror regarding his omission or reason to omit the fact of the friendship. Indeed neither the Commonwealth or the trial judge appeared at all disturbed by the juror's behavior, even after Murphy strongly requested that the juror be dismissed because of the clear prejudice to Murphy at that point. Nor was the hearing conducted by the trial judge sufficient to rebut the presumption of prejudice in this case.

In United States v. Shapiro, the court ruled that the government had not rebutted the presumption of prejudice even though the jurors affirmed their impartiality and the trial judge had concluded that juror discussion of a bribery attempt was "fleeting" and "general". Shapiro, 669 F.2d at 600-01. In United States v. Cheek the court explained that "[t]o implement the heavy obligation

of the party who seeks to rebut the presumption of prejudice, . . .
the proof must establish that there is no reasonable possibility
that the verdict was affected by the contact." 94 F.3d at 142. Given
the juror's dishonesty when questioned about his conversation with
Attorney Fox, there is at least a reasonable possibility that he was
tainted by what he learned from his close friend about Murphy. In
addition there was the very serious fact that the juror was not
honest with the judge about the nature of his friendship with
Attorney Fox, a fact which raises serious doubts about the juror's
potential bias and ability to be fair in deliberations. The
Commonwealth failed to rebut this presumption.

The Appeals Court held Murphy to a burden of proving 'actual
prejudice' and the Supreme Judicial Court upheld this erroneous
standard by denying Murphy's Application for Further Appellate
Review. Commonwealth v. Murphy, 59 Mass. App. Ct. at 581. This
contravenes clearly established clearly established Supreme Court
precedent that requires the *Commonwealth* to prove harmlessness
beyond a reasonable doubt. The Appeals Court's failure to apply this
constitutionally required standard of review is an "unreasonable
application of clearly established Federal law, as determined by the
Supreme Court of the United States". 28 U.S.C. § 2254 (d) (1). The
Sixth Circuit has granted a habeas petition on precisely this issue;
the state court's failure to apply a constitutionally required
standard for evaluating prejudice in a jury-taint case was an

21

unreasonable application of clearly established Federal law. See

Nevers v. Killinger, 169 F.3d 352, 370-73 (6th Cir.1999). This Court

should do the same.

## V. CONCLUSION

For the reasons stated above, the Petitioner John Derek Murphy

respectfully requests that this Court grant his request for review

pursuant to 28 U.S.C. § 2254(d).

Respectfully submitted,

Angela G. Lehman
BBO 567411
18 Tremont Street, Suite 902
Boston, MA 02108
617-399-6720

Date: June 23, 2005

## CERTIFICATE OF SERVICE

I, Angela G. Lehman, do hereby certify that I have mailed a copy of
the within Memorandum to AAG Maura McLaughlin, Criminal Bureau, One
Ashburton Place, Boston, MA 02108 on June 23, 2005.

Angela G. Lehman

02:42 PM

## Commonwealth of Massachusetts
### MIDDLESEX SUPERIOR COURT
### Case Summary
### Criminal Docket

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| | | | | | |
|---|---|---|---|---|---|
| **File Date** | 04/23/1998 | **Status** | dsenimp | | Disposed (sentence imposed) |
| **Status Date** | 10/19/2000 | **Session** | 7 | | Indictment |
| **Return Date** | 4/29/1998 | **Origin** | I | | Crim 7 (6A Cambridge) |
| **Lead Case** | | **Jury Trial** | y | | **Public View** Yes |

| | | | | | |
|---|---|---|---|---|---|
| **Trial Deadline** | 04/29/1999 | **Deadline Status** | | Deadline active since retu | **Status Date** | 02/16/2000 |
| **Custody Status** | | **Dangerous Weapon** | | | **Illegal Substance** |
| **Prior Record** | Unknown | **Social Risk** | | Unknown | |
| **Arraignment** | 04/29/1998 | **PTC Deadline** | | 07/28/1998 | **Pro Se Defendant** |

### OFFENSES

| Num | Offense | Code | Status | Status Date |
|---|---|---|---|---|
| 1 | 01/31/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 2 | 02/02/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 3 | 02/03/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 4 | 02/07/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 5 | 03/10/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 6 | 04/08/1997 | 266:030:1.21 | Dismissed | 12/20/1999 |
| | Larceny, over $250 | | | |
| 7 | 06/07/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 8 | 06/07/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 9 | 06/09/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 10 | 06/10/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 11 | 06/10/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 12 | 06/19/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 13 | 06/24/1997 | 266:030:1.21 | Dismissed | 12/20/1999 |
| | Larceny, over $250 | | | |
| 14 | 07/03/1997 | 266:030:1.21 | Guilty verdict | 10/18/2000 |
| | Larceny, over $250 | | | |
| 15 | 01/01/1997 | 266:037C | Guilty verdict | 10/18/2000 |
| | Credit card, fraudulent use to obtain money/goods | | | |
| 16 | 06/13/1997 | 267:001 | Guilty verdict | 10/18/2000 |
| | Forgery, record/return/writing | | | |

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Num | Offense | Code | Status | Status Date |
|------|----------|------|--------|-------------|
| 17 | 06/13/1997 | 267:005 | Guilty verdict | 10/18/2000 |
| | Forgery, utter false record/deed/writing | | | |
| 18 | 06/13/1997 | 090:024B | Guilty verdict | 10/18/2000 |
| | Falsify/steal permit/license/registration/inspection | | | |

### PARTIES

| | |
|---|---|
| **Defendant**<br>John D. Murphy<br>Active 04/23/1998 | Private Counsel 547598<br>Aviva E Jeruchim<br>Gordon & Wise<br>101 Federal Street<br>17th floor<br>Boston, MA 02110-1844<br>Phone: 617-261-0100<br>Fax: 617-261-0789<br>Withdrawn 11/01/2000 |
| | Private Counsel 567411<br>Angela G Lehman<br>Cosgrove Eisenberg & Kiley<br>22 High Street<br>Suite 4<br>Medford, MA 02155<br>Phone: 781-396-8740<br>Fax: 6l7-330-8774<br>Active 11/01/2000 Notify |
| **Plaintiff**<br>Commonwealth<br>Active 04/23/1998 | District Atty's Office 301035<br>David P Linsky<br>Witmer Karp Warner & Thoutte<br>28 State Street<br>Boston, MA 02109<br>Phone: 617-248-0550<br>Fax: 617-722-2239<br>Withdrawn 05/05/1999 |
| | District Atty's Office 561536<br>Lincoln S Jalelian<br>Middlesex County District Atty's Office<br>40 Thorndike Street<br>East Cambridge, MA 02141<br>Phone: 617-679-6500<br>Fax: 617-225-0871<br>Active 05/05/1999 Notify |

### ENTRIES

| Date | Paper | Text |
|------|-------|------|
| 04/23/1998 | 1.0 | Indictment returned |
| 04/23/1998 | 2.0 | Writ of Habeas Corpus issued to Southeastern Correctional Center (Bridgewater) for 4/29/98 |
| 04/29/1998 | 3.0 | Affidavit of indigency filed; approved (Charles M Grabau, Justice)Intake Prepared By PO Paterna Court Appoints Scheduled Bar |

$h\,20$

# Commonwealth of Massachusetts
## MIDDLESEX SUPERIOR COURT
### Case Summary
### Criminal Docket

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|------|-------|------|
| | 3.0 | Advocate Aviva Jeruchim,Esq |
| 04/29/1998 | 4.0 | Appointment of Counsel Jeruchim |
| 04/29/1998 | | Appearance of Commonwealth's Atty: Linsky |
| 04/29/1998 | | Deft arraigned before Court(Charles M Grabau, Justice) |
| 04/29/1998 | | RE offense 1: Plea of not guilty |
| 04/29/1998 | | RE offense 2: Plea of not guilty |
| 04/29/1998 | | RE offense 3: Plea of not guilty |
| 04/29/1998 | | RE offense 4: Plea of not guilty |
| 04/29/1998 | | RE offense 5: Plea of not guilty |
| 04/29/1998 | | RE offense 6: Plea of not guilty |
| 04/29/1998 | | RE offense 7: Plea of not guilty |
| 04/29/1998 | | RE offense 8: Plea of not guilty |
| 04/29/1998 | | RE offense 9: Plea of not guilty |
| 04/29/1998 | | RE offense 10: Plea of not guilty |
| 04/29/1998 | | RE offense 11: Plea of not guilty |
| 04/29/1998 | | RE offense 12: Plea of not guilty |
| 04/29/1998 | | RE offense 13: Plea of not guilty |
| 04/29/1998 | | RE offense 14: Plea of not guilty |
| 04/29/1998 | | RE offense 15: Plea of not guilty |
| 04/29/1998 | | RE offense 16: Plea of not guilty |
| 04/29/1998 | | RE offense 17: Plea of not guilty |
| 04/29/1998 | | RE offense 18: Plea of not guilty |
| 04/29/1998 | | Deft released on personal recognizance |
| 04/29/1998 | | Defendant Serving Sentence Bail Warnings To Be Read At Time Bail Is Set |
| 04/29/1998 | | Continued until 5-18-98 For PTC |
| 04/29/1998 | | Reporter present: Barbara Marigliano |
| 04/29/1998 | 5.0 | Commonwealth Files Statement Of The Case |
| 05/18/1998 | | Continued until 6/9/98 Nem |
| 05/18/1998 | | Reporter present: Joan CAve |
| 05/18/1998 | 6.0 | Pre-trial conference report filed in court |
| 06/09/1998 | | Continued until 7/6/98 ATD?LC |
| 06/09/1998 | | Reporter present: Barbara Marigliano |
| 06/09/1998 | 7.0 | Motion by Deft: For Discovery And Production Of Discoverable Information |
| 06/30/1998 | | Continued until 08/19/98 Filing Motion to Suppress |
| 06/30/1998 | | Reporter present: Barbara Marigliano |
| 07/01/1998 | 8.0 | Writ of Habeas Corpus issued to Southeastern Correctional Center (Bridgewater) 07/06/98 |
| 08/19/1998 | | Continued until 10/19/98 Motion to Suppress |
| 08/19/1998 | | Reporter present: Debbie Belanger |
| 10/15/1998 | 9.0 | Writ of Habeas Corpus issued to Southeastern Correctional Center (Bridgewater) for 10/19/98 |
| 10/19/1998 | | Continued until 12/16/98 Motion to Supress |
| 10/19/1998 | | Reporter present: Barbara Gandolfo |
| 10/19/1998 | | Bail set: Parties Came Before The Court (Paul A Chernoff, Justice) To |

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|------|-------|------|
| | | Argue Bail New Bail $7500 Cash |
| 10/19/1998 | | Bail warning given in open Court. Mittimus Issued |
| 10/19/1998 | | Reporter present: Barbara Gandolfo |
| 12/09/1998 | 10.0 | Writ of habeas corpus issued MCI Bridgewater S.E.C.C. for 12/16/98 |
| 12/16/1998 | | Continued until 2/24/99 Motion to Suppress & 4/1/99 Trial |
| 12/16/1998 | | Reporter present: Debbie Belanger |
| 12/16/1998 | 11.0 | Motion by Deft: To Dismiss And/Or Suppress Statements And Evidence |
| | | With An Affidavit Attached Filed In Court |
| 01/22/1999 | 12.0 | Bail satisfied: $7,500. (Red #8638) Surety: Lori A Barrett |
| 02/24/1999 | | Continued until 03/15/99 Status |
| 02/24/1999 | | Reporter present: Barbara Gandolfo |
| 03/15/1999 | | Continued until 04/26/99 Motion to Suppress & 06/08/99 Trial |
| 03/15/1999 | | Reporter present: Barbara Gandolfo |
| 04/26/1999 | | Continued until 06/22/99 Motion to Suppress & 08/10/99 Trial |
| 04/26/1999 | | Reporter present: Paula Connelly |
| 04/29/1999 | | Writ of Habeas Corpus issued to Suffolk County Jail (Nashua Street) |
| | | for 05/05/99 |
| 05/05/1999 | | Continued until 06/22/99 Motion to Suppress |
| 05/05/1999 | | Reporter present: Lisa Napolitano |
| 05/05/1999 | 13.0 | Habeas corpus for Deft Returned Without Service |
| 05/05/1999 | | Appearance of Commonwealth's Atty: Jalelian |
| 05/05/1999 | | Motion To Increase Bail Allowed After Hearing Bail Set:$50,000 Cash |
| 05/05/1999 | | Mittimus Issued |
| 05/05/1999 | | Bail Warnings Read In Open Court |
| 05/05/1999 | | Reporter present: Lisa Napolitano |
| 05/05/1999 | 14.0 | Motion by Commonwealth: To Increase Bail Based On Changed |
| | | Circumstances |
| 05/05/1999 | | Motion (P#14) Allowed Bail Increased $42,500 To Total $50,000 |
| | | (Catherine A White, Justice) |
| 06/14/1999 | | writ of habeas corpus issued to Keeper Jail Nashua St. 06/22/99 |
| 06/21/1999 | | Continued until 08/19/99 Motion to Suppress |
| 06/21/1999 | | Reporter present: Harriet Sears |
| 06/22/1999 | | $7,500 Cash Bail Is Ordered Returned To The Surety Defendants Bail |
| | | Remains At $50,000 Cash (Thomas E Connolly, Justice) |
| 06/22/1999 | 15.0 | Habeas Corpus For Deft Returned without Service |
| 08/11/1999 | | Writ of Habeas Corpus to receive issued to Cambridge Jail. 8/19/99 |
| 08/19/1999 | | Continued until 10/01/99 Motion to Suppress |
| 08/19/1999 | | Reporter present: Harriet Sears |
| 10/01/1999 | | Continued until 10/27/99 Motion to Suppress |
| 10/01/1999 | | Reporter present: John Lynch |
| 10/20/1999 | | Habeas corpus for Deft at Keeper of the Jail Nashua Street for |
| | | 10/27/99 |
| 10/27/1999 | | Continued until 11/04/1999 Status |
| 10/27/1999 | | Reporter present: Diane Grasso |
| 10/27/1999 | 16.0 | Habeas corpus for Deft returned without service |
| 11/04/1999 | | Continued until 11/19/1999 Motion to Suppress |

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|------|-------|------|
| 11/04/1999 | | Reporter present: Paula Connelly |
| 11/10/1999 | | Habeas corpus for Deft MCI Concord for 11/19/99 |
| 11/15/1999 | | Habeas corpus for Deft at MCI Concord |
| 11/15/1999 | 17.0 | Request For Advancement Filed And Allowed (Charles Grabau, Justice) |
| 11/15/1999 | | Advanced to 11/17/99 for Motion to Suppress |
| 11/17/1999 | | Sent to Session 8 Motion to Suppress |
| 11/17/1999 | 17.1 | Motion by Deft: to dismiss -lack of evidence |
| 11/17/1999 | | Motion (P#17.1) filed in court and set for hearing on 12-1-99 in 16A (Spurlock,J) |
| 11/22/1999 | 17.2 | Deft files memorandum in support of motion to suppress |
| 11/22/1999 | 17.3 | Commonwealth files proposed findings of fact and rulings of law |
| 12/13/1999 | | Habeas corpus for Deft at M,C,I at Concord, for 12/16/99 |
| 12/16/1999 | 18.0 | Motion by Deft: to dismiss with an affidavit and memorandum attached |
| 12/16/1999 | | Motion (P#18) After a review of the Grand Jury minutes the motion is Denied as to all counts except count 013 & 006 which the commonwealth indicated in open court it was dimissimg (Spurlock,J) |
| 12/17/1999 | | Motion (P#11) Denied. By the Court, Spurlock, J |
| 12/17/1999 | 19.0 | Commonwealth files bill of particulars |
| 12/17/1999 | 20.0 | Rulings of law, and order on defendants motion to suppress evidence and statements Re: for the foregoing reasons it is hereby ORDERED that the defendants motion to suppress statements and evidence is DENIED (Spurlock,J) |
| 12/20/1999 | | RE Offense 6:Dismissed |
| 12/20/1999 | | RE Offense 13:Dismissed |
| 12/22/1999 | 21.0 | Defendant's Notice of Interlocutory Appeal. |
| 01/10/2000 | 22.0 | Motion by Commonwealth: To Dismiss |
| 01/10/2000 | 23.0 | SJC-Notice of Docket Entry: You are hereby notified that on 1/5/00 the following was entered on the docket of hte above referenced case: Memorandum & Order, as on file. (Interlocutory appeal) Denied. (Spina, J.) |
| 02/02/2000 | 24.0 | Motion by Deft:to convert trial date to lobby conference date filed in court and allowed |
| 02/02/2000 | | Continued until 2-16-00 Lobby (Grabau,J) |
| 02/10/2000 | | Habeas corpus for Deft at M.C.I. at Concord for 2/16/00 |
| 02/16/2000 | 25.0 | Habeas corpus for Deft returned without service |
| 02/18/2000 | 26.0 | Habeas corpus for Deft at Cambridge Jail for 2/28/00 |
| 02/28/2000 | 27.0 | Motion by Deft: Ex Parte motion for funds for expert witness with affidavit attached filed in court |
| 02/28/2000 | | Motion (P#27) Allowed up to $2000 (Fahey,J) |
| 02/28/2000 | | Motion by Deft: Verbal to withdraw and of her review motion is denied (Fahey,J) |
| 03/23/2000 | | Filed by Deft. Attorney: Notice of Change of Address and Affiliation |
| 04/18/2000 | 28.0 | Request by defendant for continuance allowed (Gants,J) |
| 04/18/2000 | | Continued until 5-19-00 Trial |
| 05/11/2000 | | Habeas corpus for Deft at MCI Concord for 5/19/00 |
| 05/19/2000 | | Sent to 6A for trial |

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|------|-------|------|
| 05/24/2000 | | Returned to First Session |
| 05/24/2000 | | Continued until 6/8/00 for ATD |
| 05/24/2000 | | Reporter present: John Lynch |
| 06/08/2000 | | Continued until 08/07/2000 Trial |
| 06/08/2000 | | Reporter present: John Lynch |
| 06/13/2000 | | Habeas corpus for Deft at MCI at Concord for 6/15/00 |
| 06/27/2000 | 29.0 | Commonwealth files Proposed Witness List |
| 08/18/2000 | 30.0 | Motion by Deft: To Transfer Prior to Trial with Affidaivit in Support |
| | | of Motion to Transfer Prior To Trial |
| 08/18/2000 | | Motion P#30 No Action Taken (Charles Grabau, Justice) notice sent |
| 08/18/2000 | 31.0 | Ex Parte Motion by Deft: For Funds For Expert Witness with Affidavit |
| | | in Support of Motion For Funds For Expert Witness |
| 08/18/2000 | | Motion (P#31) allowed in an amount not to exceed $1,500.00 (Charles |
| | | M. Grabau, R. A. J.) certified copy sent to deft's counsel |
| 08/25/2000 | 32.0 | Deft files Proposed Witness and Exhibit List |
| 08/29/2000 | | Habeas corpus for Deft at MCI at Concord for 9/5/00 |
| 09/01/2000 | 33.0 | Deft files amended proposed witness and exhibit list |
| 09/05/2000 | 34.0 | Motion by Deft: For Examination Of Jurors. Filed In Court |
| 09/05/2000 | 35.0 | Motion by Deft: For Sequestration Of Witnesses. Filed In Court. |
| 09/05/2000 | | Motion (P#35) allowed (Sandra L. Hamlin, Justice) |
| 09/05/2000 | 36.0 | Motion by Deft: In Limine To Exclude Prior Bad Acts And Irrelevant |
| | | Business Records.Filed In Court |
| 09/05/2000 | 37.0 | Motion by Commonwealth: To Admit Evidence Of Items Found In The |
| | | Defendant's Car Upon Arrest For Limited, Permissible Purpose Of Modus |
| | | Operandi. Filed In Court |
| 09/05/2000 | 38.0 | Motion by Commonwealth: To Admit Registry Of Motor Vehicle Documents. |
| | | Filed In Court |
| 09/05/2000 | 39.0 | Motion by Commonwealth: To Admit Cash Register Receipts From Sears |
| | | And Circuit City Which Are Duplicates Of Computer Files And Business |
| | | Records. Filed In Court |
| 09/05/2000 | 40.0 | Motion by Commonwealth: To Admit Photocopies Of Sales receipt From |
| | | Sears And Circuit City. Filed In Court. Filed In Court |
| 09/05/2000 | 41.0 | Motion by Commonwealth: To Admit Evidence Of Prior Bad Acts For |
| | | Limited, Permissible Purposes. Filed In Court. |
| 09/05/2000 | 42.0 | Motion by Deft: To Admit Photocopies Of Bank Records Of Belmont |
| | | Savings Bank, Filed In Court. |
| 09/05/2000 | | Motion P#42 Issue Moot. (Hamlin, J.) |
| 09/05/2000 | 43.0 | Motion by Deft: For Correct Indictments. Filed In Court |
| 09/06/2000 | | Motion (P#43) allowed (Sandra L. Hamlin, Justice) |
| 09/06/2000 | 44.0 | Commonwealth files Witness List. Filed In Court |
| 09/12/2000 | 45.0 | Commonwealth files Amended Bill Of Particulars |
| 10/10/2000 | | Defendant's Motion (see P#34) See record. (Hamlin, J.) |
| 10/10/2000 | | Defendant's Motion (P#36) Allowed in part and Denied in part. (See |
| | | Record) (Hamlin, J.) |
| 10/10/2000 | | Motion (P#37) after hearing motion allowed as to certain items |
| | | (Hamlin, J.) |

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|---|---|---|
| 10/10/2000 | | Motion (P#38) motion allowed after hearing (Sandra L. Hamlin, Justice) |
| 10/10/2000 | | Motion (P#39) allowed after hearing (Sandra L. Hamlin, Justice) |
| 10/10/2000 | | Motion (P#40) allowed after hearing (Sandra L. Hamlin, Justice) |
| 10/10/2000 | 46.0 | Motion by Commonwealth: In Limine Regarding Demonstrative Charts, And A Powerpoint Demonstration |
| 10/10/2000 | | Commonwealth's Motion (see P#46) allowed in part and denied in part. (Sandra L Hamlin, Justice) |
| 10/10/2000 | 47.0 | Motion by Deft: In Limine To Admit Evidence filed in Court |
| 10/10/2000 | | Motion (P#47) after hearing allowed (Sandra L. Hamlin, Justice) |
| 10/12/2000 | | Juror #6 Roberta White excused from the panel. |
| 10/13/2000 | 48.0 | Commonwealth: Request For Jury Instructions filed in Court |
| 10/16/2000 | 49.0 | Defendant's Request for Jury Instructions I, filed in Court |
| 10/16/2000 | | Juror #1 Sharon Bryan excused from the panel. |
| 10/17/2000 | 50.0 | Motion by Deft: For Required Finding Of Not Guilty At Close Of Commonwealth's Case, filed in Court |
| 10/17/2000 | | Motion (P#50) At the close of the Commonwealth's case and after hearing, motion Denied as to all indictments (Sandra L. Hamlin, Justice) |
| 10/17/2000 | 51.0 | Motion by Deft: For Required Finding Of Not Guilty At Close Of All The Evidence filed in Court |
| 10/17/2000 | | Motion (P#51) At the close of all the evidence and after hearing, motion denied (Sandra L. Hamlin, Justice) |
| 10/18/2000 | 52.0 | Request for Jury Instructions II, filed in Court |
| 10/18/2000 | 53.0 | Verdict Slips - Verdict of guilty offenses , 001, 002, 003, 004, 005, 007, 008, 009, 010, 011, 012 and 014, 015, 016, 017 and 018. |
| 10/18/2000 | | RE Offense 1:Guilty verdict |
| 10/18/2000 | | RE Offense 2:Guilty verdict |
| 10/18/2000 | | RE Offense 3:Guilty verdict |
| 10/18/2000 | | RE Offense 4:Guilty verdict |
| 10/18/2000 | | RE Offense 5:Guilty verdict |
| 10/18/2000 | | RE Offense 7:Guilty verdict |
| 10/18/2000 | | RE Offense 8:Guilty verdict |
| 10/18/2000 | | RE Offense 9:Guilty verdict |
| 10/18/2000 | | RE Offense 10:Guilty verdict |
| 10/18/2000 | | RE Offense 11:Guilty verdict |
| 10/18/2000 | | RE Offense 12:Guilty verdict |
| 10/18/2000 | | RE Offense 14:Guilty verdict |
| 10/18/2000 | | RE Offense 15:Guilty verdict |
| 10/18/2000 | | RE Offense 16:Guilty verdict |
| 10/18/2000 | | RE Offense 17:Guilty verdict |
| 10/18/2000 | | RE Offense 18:Guilty verdict |
| 10/18/2000 | | Commonwealth moves for sentence. |
| 10/18/2000 | | Continued until October 19, 2000 at 10:00am for disposition. |
| 10/18/2000 | | BAIL REVOKED.(Sandra L Hamlin, Justice) |
| 10/18/2000 | | Defendant committed into custody of Sheriff. |
| 10/18/2000 | | Mittimus without bail issued to custody of Sheriff |

case01 142067 y y y y y n y

R 25

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|------|-------|------|
| 10/19/2000 | | Sentence imposed: Offenses 001, 002, 003, 004, 005, 007, 008, 009 - MCi, Cedar Junction for a term not exceeding 5 yrs or less than 4 &1/2 yrs. Offenses 002, 003, 004, 005, 007, 008 and 009 to be served concurrently with the sentence imposed this day in offense 001. . Offense 010 MCI, Cedar Junction for a term not exceeding 5 yrs or less than 4 & 1/2 yrs. to take effect from and after the expiration of sentence imposed this day in offenses 001 thru 009. Offenses 011, 012, 014 and 015 MCI, Cedar Junction for a term not exceeding 5yrs or less than 4 & 1/2yrs to be served concurrently with the sentence imposed this day in offense 010. Offenses 016 and 017 MCI, Cedar Junction for a term not exceeding 10yrs of less than 9 yrs to be served concurrently with the sentence imposed this day in offense 001. Offense 018 Filed by Order of Hamlin, J. deft not objecting thereto (Hamlin, J.) |
| 10/19/2000 | | Sentence credit given as per 279:33A: 109 days |
| 10/19/2000 | | Victim-witness fee assessed: $60. thru institution (Hamlin, J.) |
| 10/19/2000 | | Custody of Sheriff revoked |
| 10/19/2000 | | Mittimus issued to MCI, Cedar Junction |
| 10/19/2000 | | Notified of right of appeal under Rule 64 |
| 10/19/2000 | | Notified of right of appeal under Rule 65 |
| 10/19/2000 | | List of Exhibits filed |
| 10/19/2000 | | Attested copies of indictments sent to MCI Cedar Junction and abstract on offense 018 sent to Registrar of Motor Vehicles. |
| 10/19/2000 | | Reporter present: Lisa Napolitano |
| 10/19/2000 | 54.0 | Notice of Appeal of certain opinions, rulings, directions and judgments of the Court, filed in Court (copy to Judge & ADA) |
| 10/19/2000 | 55.0 | Attorney Jeruchim 's Motion to Withdraw and Appointment of Appellate Counsel filed in Court |
| 10/19/2000 | | Motion (P#55) after hearing, motion allowed subject to Appellate review of the sentences. (Hamlin, J.) copy sent to atty and CPCS |
| 10/24/2000 | 56.0 | Mittimus returned committing defendant into custody of Sheriff with service |
| 10/25/2000 | 57.0 | Defendant's Appeal from Sentence to MCI, Cedar Junction to the Appellate Divison of the Superior Court (Judge notified) |
| 10/26/2000 | | Court Reporter Barbara Gandolfo is hereby notified to prepare one copy of the transcript of the evidence of 11/17/1999. |
| 10/26/2000 | | Court Reporter Robert Jacques is hereby notified to prepare one copy of the transcript of the evidence of 02/28/2000 Lobby conference. |
| 10/26/2000 | | Court Reporter Lisa Napolitano is hereby notified to prepare one copy of the transcript of the evidence of 10/10, 11, 12, 13, 16, 17, 18 and 19, 2000 Pretrial motions, Trial and Disposition before Judge Hamlin |
| 10/26/2000 | 58.0 | Mittimus MCI, Cedar Junction offenses (001,2,3,4,5,7,8 & 9); (010,011,012 & 014); (015); (016) and (017) returned with service. |
| 10/27/2000 | | Attested copies of indictments, mittimus and docket entries sent to the Clerk of the Appellate Division this day. |

case01 142067 y y y y y n y

R 25 a

02:42 PM

**Commonwealth of Massachusetts**
**MIDDLESEX SUPERIOR COURT**
**Case Summary**
**Criminal Docket**

11/27/2000

MICR1998-00613

Commonwealth v Murphy, John D.

| Date | Paper | Text |
|------|-------|------|
| 11/01/2000 | 59.0 | Appointment of Counsel Angela G Lehman |
| 11/06/2000 | | Victim-witness fee paid as assessed $60.00 |
| 11/27/2000 | | Appearance of Deft's Atty: Angela G Lehman |

R 25b

59 Mass. App. Ct. 571, *; 797 N.E.2d 394;
2003 Mass. App. LEXIS 1096, **

119Z7F

## COMMONWEALTH vs. JOHN D. MURPHY.

### No. 01-P-592

### APPEALS COURT OF MASSACHUSETTS

*59 Mass. App. Ct. 571; 797 N.E.2d 394; 2003 Mass. App. LEXIS 1096*

**October 17, 2002, Argued**
**October 15, 2003, Decided**

**PRIOR HISTORY:** [**1] Middlesex. Indictments found and returned in the Superior Court Department on April 23, 1998. The cases were tried before Sandra L. Hamlin, J.

**DISPOSITION:** Judgments affirmed.

**LexisNexis (TM) HEADNOTES - Core Concepts:**

**COUNSEL:** Angela G. Lehman for the defendant.

Sheryl F. Grant, Assistant District Attorney, for the Commonwealth.

**JUDGES:** Present: Gelinas, Doerfer, & Green, JJ.

**OPINIONBY:** GELINAS

## OPINION:

[*572]    GELINAS, J. The defendant, John D. Murphy, was indicted in Middlesex Superior Court on fourteen counts of larceny over $ 250 ( *G. L. c. 266, § 30)*, and one count each of fraudulent use of a credit card to obtain money or goods ( *G. L. c. 266, § 37C*); forgery of a record/return or writing ( *G. L. c. 267, § 1*); uttering ( *G. L. c. 267, § 5*); and falsifying or stealing a driver's license ( *G. L. c. 90, § 24B*). Two counts of larceny over $ 250 subsequently were dismissed by the Commonwealth. After trial, a jury returned verdicts of guilty on the remaining sixteen counts. Murphy appeals from the convictions, n1 claiming (1) error in the trial court's refusal to strike the conclusions of a handwriting expert, and to limit the use by the expert of [**2] certain standards of comparison; (2) that the trial judge committed reversible error in arbitrarily finding that a bank signature card was a legal document within the meaning of *G. L. c. 267, § 1*; (3) that there was insufficient evidence to support convictions of larceny over $ 250, forgery, and uttering; (4) that the trial court

committed reversible error in failing to declare a mistrial after discovering that a juror was a close friend of, and had engaged in discussion with, an attorney, not the trial attorney, who represented Murphy in a different pending criminal matter; and (5) that certain indictments should have been dismissed, as the Commonwealth had presented misleading and insufficient evidence to the grand jury. We affirm.

> N1 The defendant's conviction for falsifying or stealing a driver's license was placed on file without objection and is not here at issue.

We summarize the facts, adding detail as necessary to a discussion of the issues. Between January 31, 1997, and July 3, 1998, the [**3] identities of six different people were stolen. n2 Through use of these identities, televisions, video cassette recorders, [*573] furniture, and computers, to the value of at least $ 17,000, were obtained from different vendors, including several stores operated by Sears and Circuit City. In addition, the stolen identities were used to open bank accounts and accounts at Mailboxes, Etc. It is undisputed that the six people whose identities were used, all named either John Murphy or Michael Sullivan, did not purchase the goods or open the accounts in question.

> n2 Identity theft occurs when someone appropriates a person's personal information without that person's knowledge to commit fraud or theft. It is accomplished by co-opting a person's name, social security number, credit card number, or some other piece of personal information for illicit use. See generally http://www.consumer.gov/idtheft, an Internet Web site maintained by the Federal Trade Commission.

59 Mass. App. Ct. 571, *; 797 N.E.2d 394;
2003 Mass. App. LEXIS 1096, **

As a result of investigation, the defendant was arrested. In [**4] the course of the arrest, the police recovered, from a vehicle he had rented and in which he was seated at the time of arrest, various credit cards, receipts, checks, invoices, bank receipts, other commercial documents, and three birth certificates. We review each of the defendant's claimed errors in turn.

Handwriting Analysis. At trial, the Commonwealth called Nancy McCann as a witness. After hearing testimony concerning her credentials, the judge allowed her to testify as a handwriting expert. The defendant timely moved to strike a number of exhibits she had used as standards of comparison for the defendant's signature. n3 These included seven letters sent to the clerk of the Middlesex Superior Court, all relating to the case pending against the defendant and signed "John Murphy," and eight documents bearing the signature "Michael Sullivan," found in the car the defendant had rented and was operating at the time of his arrest. The defendant claims that, without testimony by persons who saw him sign each exemplar used as a standard of comparison, the documents should not have been admitted, or, in the alternative, the trial judge should have given a limiting instruction. Murphy [**5] contends that failure either to strike or give the instruction impermissibly shifted the burden of proof.

> n3 The defendant made no objection regarding the use of the defendant's signature from (1) the Miranda card and the booking sheet he signed when arrested; (2) a redacted bail recognizance form and a redacted affidavit of indigency form he signed at arraignment; (3) a "Michael Sullivan" signature from a bank signature card; and (4) a "Michael Sullivan" signature from a license that the defendant had procured. All were used as standards of comparison.

To have them admitted, the Commonwealth was required to show by a preponderance of the evidence that the defendant signed the exemplars. See *Commonwealth v. Polian, 288 Mass. 494, 499, 193 N.E. 68 (1934)*. It was for the trial judge to determine whether [*574] the Commonwealth satisfied its burden. There was here ample evidence to support the trial judge's preliminary finding to that effect. As to the letters, they were addressed to the court clerk. They [**6] requested information about the defendant's case, included the case docket number, and bore the signature "John Murphy." As to the "Michael Sullivan" signatures, they were affixed to documents found in the rented car being driven by the defendant at the time of his arrest. In addition, two

of those documents bore the defendant's picture next to the "Michael Sullivan" signature, and there was evidence from a bank employee that the defendant had produced a license showing that he was "Michael Sullivan" when he signed another of the documents.

It is not obvious to us, and the defendant proposes no intelligible basis to believe, that the judge's well-supported preliminary evidentiary determination somehow shifted an impermissible burden onto the defendant or otherwise prejudiced him in any way. The judge's preliminary findings were not communicated to the jury. Neither did admitting the exemplars create any presumption or compel any conclusion. Instead, the judge left it to the jury to draw their own fair inferences. There was no error.

The defendant next argues that the judge erred in failing to strike McCann's testimony as to certain conclusions she reached with respect to the authorship [**7] of the questioned signatures. n4 No objection or motion to strike was taken at the time McCann initially testified; the defendant did not move to strike the testimony until the following day, after lengthy cross-examination. The objections and motions to strike were not timely. See *Commonwealth v. Silvia, 343 Mass. 130, 135-136, 177 N.E.2d 571, (1961)* (objections "must be taken to evidence when it is offered"); *Commonwealth v. Wood, 17 Mass. App. Ct. 304, 307, 457 N.E.2d 1131 (1983)*; *Commonwealth v. Pagano, 47 Mass. App. Ct. 55, 59, 710 N.E.2d 1034 (1999)*, cert. denied, *528 U.S. 1089, 145 L. Ed. 2d 690, 120 S. Ct. 820 (2000)*. We review only to determine whether an error occurred that created a substantial [*575] risk of a miscarriage of justice. See *Commonwealth v. Epsom, 399 Mass. 254, 259-260, 503 N.E.2d 954 (1987)*.

> n4 The testimony included statements that "it is highly probable that all of the questioned John Murphy and M. Sullivan signatures appearing on the various charge slips . . . were written by the same individual," and that "it is more probable than not that all of the questioned signatures were written by the same person who authored the numerous John Murphys and Michael Sullivan signatures."

[**8]

Citing to *United States v. Hines, 55 F. Supp. 2d 62 (D. Mass. 1999)*, the defendant argued at trial, and argues again on appeal, that conclusions by a handwriting expert should not be considered because of weaknesses in their scientific reliability. n5 The defendant, however, never requested a Lanigan hearing, see *Commonwealth v. Lanigan, 419 Mass. 15, 24-27, 641 N.E.2d 1342 (1994)*,

Case 1:05-cv-10548-JLT    Document 11-2    Filed 06/23/2005    Page 12 of 35

Page 3

59 Mass. App. Ct. 571, *; 797 N.E.2d 394;
2003 Mass. App. LEXIS 1096, **

to determine whether McCann could testify as to her conclusions regarding the handwriting exemplars. Had he wanted to challenge the scientific reliability of McCann's testimony, he should have filed a motion for a hearing prior to the introduction of the evidence. See *Commonwealth v. Sparks, 433 Mass. 654, 659, 746 N.E.2d 133 (2001)* (to preserve an objection based on scientific unreliability, defendant must file an appropriate pretrial motion stating the grounds for the objections, and must request a hearing in accordance with the principles set forth in *Canavan's Case, 432 Mass. 304, 309-312, 733 N.E.2d 1042 [2000]*, and *Commonwealth v. Lanigan, supra*). Because the defendant did not object until after McCann had [**9] testified, there was no voir dire hearing regarding the scientific reliability of McCann's testimony. See *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).*

> n5 In *Hines*, the defendant moved prior to trial, in accordance with *Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993)*, and *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 143 L. Ed. 2d 238, 119 S. Ct. 1167 (1999)*, to exclude the entire testimony of the government's handwriting expert on grounds that such evidence was not scientifically reliable. Applying the four principles laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc., supra at 592-595* (i.e., [1] whether the expert's technique can be or has been tested; [2] whether the method has been subjected to peer review and publication; [3] the known or potential rate of error of the technique; and [4] whether there is "general acceptance" of the technique within the relevant scientific community, to the extent that one exists), the trial judge admitted the expert's testimony concerning similarities and dissimilarities between known exemplars of the defendant's handwriting and a note used in an armed robbery, and that the writings were consistent with each other, but declined to permit the expert to give any ultimate conclusions as to authorship.

[**10]

Unlike the case in *Sparks*, the defendant here did raise the issue after McCann testified, and again after extensive cross-examination. We consider whether the argument has merit, and whether the trial judge abused her discretion or committed error of law resulting in a substantial risk of a miscarriage of justice. [*576] See and compare *Canavan's Case, supra at 312*. We conclude that the testimony of a handwriting expert

about who wrote or signed a document is of that variety of "soft science" that is highly dependent on information derived from such sources as personal observations, clinical assessments, and statistical data, and as such we defer especially to the judge's exercise of discretion. *Id. at 318*.

Additionally, the opinion of a handwriting expert as to the probability of authorship has a long history of acceptance in our jurisprudence. See, e.g., *Commonwealth v. Buckley, 410 Mass. 209, 213-214, 571 N.E.2d 609 (1991)* (two handwriting experts testified that handwriting "matched" and defendant "probably" wrote the document, while third testified that there was the "highest probability" that the defendant wrote the document); *Commonwealth v. Romero, 25 Mass. App. Ct. 51, 52, 514 N.E.2d 1333 (1987)* [**11] (evidence jury could consider included testimony of handwriting expert that "a great many names" appeared to have been written by the same person); *Commonwealth v. Lima, 29 Mass. App. Ct. 490, 497, 562 N.E.2d 100 (1990)* (handwriting expert opined that, based on court documents, the defendant signed an auto rental agreement). We conclude that, as the courts in Massachusetts have long accepted as reliable expert testimony about the authorship of handwriting, a Lanigan hearing was not necessary even had one properly been requested. See *Commonwealth v. Frangipane, 433 Mass. 527, 538, 744 N.E.2d 25 (2001)* (Lanigan hearing not necessary where qualified expert testimony has been accepted as reliable in the past in Massachusetts appellate cases). n6 There was no abuse of discretion or error of law in admitting the challenged testimony.

> n6 We see nothing in *Frangipane* that would preclude a party from requesting a Lanigan hearing should science in the particular field advance to a point where expert testimony, generally accepted as reliable in the past, would no longer be so considered. The defendant here makes no such claim; he contends only that the principles explained in Daubert and Lanigan now affect testimony by experts in the field of handwriting analysis.

[**12]

Bank signature card. The defendant next argues that the trial judge erred as matter of law when she ruled that the bank signature card he used to open a fictitious checking account was a document capable of being forged and uttered under *G. L. c. 267, § § 1, 5.* n7 [*577] He argues that, as the statute contains no specific reference to a bank signature card, he cannot be convicted under its terms. That view of the statute would

Case 1:05-cv-10548-JLT    Document 11-2    Filed 06/23/2005    Page 13 of 35

Page 4

59 Mass. App. Ct. 571, *; 797 N.E.2d 394;
2003 Mass. App. LEXIS 1096, **

permit a person, with intent to defraud, to sign signature cards and open accounts in other people's names and face no penalty for doing so. See *Commonwealth v. Dale D., 431 Mass. 757, 760, 730 N.E.2d 278 (2000)*. We conclude, rather, that a bank signature card constitutes "evidence or muniment of title to property" and, thus, is a document capable of being forged and altered under the statute.

n7 *General Laws c. 267, § 1*, as amended through St. 1986, c. 557, § 190, provides, in relevant part: "Whoever, with intent to injure or defraud, falsely makes, alters, forges or counterfeits . . . an accountable receipt for money, goods or other property; or a stock certificate, or any evidence or muniment of title to property; . . . shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years." (Emphasis supplied.)

*General Laws c. 267, § 5*, provides: "Whoever, with intent to injure or defraud, utters and publishes as true a false, forged or altered record, deed, instrument or other writing mentioned in the four preceding sections, knowing the same to be false, forged or altered, shall be punished by imprisonment in the state prison for not more than ten years or in jail for not more than two years."

[**13]

As a general rule, "a statute [must be interpreted] in accord with 'the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated, *Telesetsky v. Wight, 395 Mass. 868, 872-873, 482 N.E.2d 818 (1985)*, . . . and to avoid imputing a 'barrenness of accomplishment,' *Plymouth County Retirement Ass'n v. Commissioner of Pub. Employee Retirement, 410 Mass. 307, 312, 571 N.E.2d 1386 (1991)." Champigny v. Commonwealth, 422 Mass. 249, 251, 661 N.E.2d 931 (1996)*. While the words "evidence or muniment of title" appear directly after a specific type of document, a stock certificate, we read the words in question in the disjunctive, as the word "or" appears after the words describing several specific types of documents, see *Commonwealth v. Davie, 46 Mass. App. Ct. 25, 27, 703 N.E.2d 236 (1998)*. The use of the disjunctive "or" serves to distinguish between the types [**14] of documents [*578] contemplated. The clause

can easily be understood to read that any document that is either evidence of title to property, or a muniment n8 of title to property, may be the subject of forgery and uttering under the statute. The phrase "evidence of title" may refer to either personal or real property. Compare *Greeley v. Flynn, 310 Mass. 23, 26, 36 N.E.2d 394 (1941)* (gift of bank book, which was evidence of title, was shown by delivery of the book); and *Long v. Wickett, 50 Mass. App. Ct. 380, 382 n.3, 737 N.E.2d 885 (2000)*. We think the same principle is applicable to a muniment of title to property. There was testimony at trial that the bank signature card was evidence of title to the bank account. Certainly, a signature card would constitute evidence by which one could defend title to a bank account. A bank signature card is evidence of ownership of the account. See *Doran v. Nally, 10 Mass. App. Ct. 893, 409 N.E.2d 1321 (1980)*. Under the plain language of the statute, the Legislature intended to punish those who forged documents with the intent to injure or defraud, see *G. L. c. 267, § 1*. We are [**15] mindful that criminal statutes must be strictly construed against the government, that is, a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited. See *Commonwealth v. George, 430 Mass. 276, 278, 717 N.E.2d 1285 (1999)*. In abiding by the strict construction rule, however, the Commonwealth is permitted an "available and sensible interpretation," *Commonwealth v. Wotan, 422 Mass. 740, 743, 665 N.E.2d 976 (1996)*, quoting from *Commonwealth v. Roucoulet, 413 Mass. 647, 652, 601 N.E.2d 470 (1992)*, as we think obtains here. We conclude that the judge properly found that the bank signature card was a document both capable of being forged under *G. L. c. 267, § 1*, and uttered under *G. L. c. 267, § 5*. Compare *Commonwealth v. Gall, 58 Mass. App. Ct. 278, 288-290, 789 N.E.2d 586 (2003)* (certificate of insurance not evidence of muniment of title).

n8 Black's Law Dictionary 1038 (7th ed. 1999) defines "muniment" as a "document (such as a deed or charter) evidencing the rights or privileges of a person, family, or corporation." Webster's Third New International Dictionary 1487 (3d ed. 1993) defines "muniment" as documentary evidence by which one can defend a title to property or a claim to rights.

[**16]

Sufficiency of the evidence. Deciding, as we do, that the trial judge properly admitted both the handwriting expert's opinions and the bank signature card, it necessarily follows that the [*579] evidence, when viewed in the light most favorable to the

Case 1:05-cv-10548-JLT    Document 11-2    Filed 06/23/2005    Page 14 of 35

Page 5

59 Mass. App. Ct. 571, *; 797 N.E.2d 394;
2003 Mass. App. LEXIS 1096, **

Commonwealth, was sufficient to permit the jury to infer the existence of the essential elements of larceny over $ 250, forgery and uttering. *Commonwealth v. Latimore, 378 Mass. 671, 676-677, 393 N.E.2d 370 (1979)*. The judge did not err in denying the defendant's motions for required findings.

Juror Issue. During jury selection process, one of the jurors indicated that his father-in-law was a former United States Attorney, and that his cousin was a police officer. On the fifth day of trial, this same juror informed the court that, while the trial was ongoing, he spoke with an individual at a social gathering and learned that the defendant had other criminal matters pending in Suffolk Superior Court. At a hearing on the matter, the juror informed the judge that "somebody let out that they knew that the defendant had another criminal proceeding before the court." n9 The juror said that he had not spoken to any of the [**17] other jurors about the matter, and assured the judge that he could remain fair and impartial. n10 Based upon these representations, the defendant and his trial counsel did not move to dismiss the juror or seek a mistrial. The judge found the juror to be credible when he said that he had not talked to any of the other jurors about the matter, found that the juror remained fair and impartial, and permitted him to remain on the jury.

> n9 When asked to relate the specifics of the conversation, the juror stated that the other person, after finding out the name of the trial judge, stated, "Oh, that's the John Murphy case. He's got another one too."

> n10 At the hearing, when asked if he could remain fair and impartial, the juror stated: "Absolutely. I think it is completely irrelevant to this matter at hand. And in this country, you're innocent until proven guilty. And it is completely irrelevant as far as I'm concerned. And I only mentioned it because I thought the defendant was entitled to have, you know, the best, fairest hearing possible, which is why I wanted to bring it up to everybody's attention. It has no impact on me whatsoever."

[**18]

That evening, the defendant called Robert Fox, his trial counsel in the other case. The following day, the defendant reported to the court that Fox told him he (Fox) had run across the juror and related that Fox was the defendant's criminal attorney on the unrelated matters. The trial court ordered Fox to appear in court and then conducted a further hearing. In response to the judge's questions, Fox indicated that the juror was one of

his best friends. Fox further advised the judge that prior to this [*580] trial, he and the juror had had many discussions about his criminal defense work and the judicial system. Upon this information, the defendant's trial counsel moved for a mistrial and objected to the juror's continued participation in the trial. The trial judge made further findings as to the credibility of Fox and the juror, renewed her finding that the juror remained impartial and unbiased, denied the motion for a mistrial, and permitted the juror to remain.

The defendant argues that a high probability of prejudice exists because this juror (who had relatives in law enforcement) acquired knowledge of Murphy's open criminal matters, and that this high probability of prejudice required [**19] the trial judge either to declare a mistrial or, at least, to remove the juror from the panel. See *United States ex rel. Owen v. McMann, 435 F.2d 813, 818 (2d Cir. 1970)*, cert. denied, *402 U.S. 906, 28 L. Ed. 2d 646, 91 S. Ct. 1373 (1971)*. The defendant admits that there is no evidence of any communication with other jurors, and our review of the record finds no direct evidence of bias or partiality. Nonetheless, we recognize, as the defendant argues, that "in a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury, is, for obvious reasons, deemed presumptively prejudicial." *Remmer v. United States, 347 U.S. 227, 229, 98 L. Ed. 654, 74 S. Ct. 450 (1954)*.

In Remmer, the defendant, charged with income tax evasion, learned that in the course of the trial someone suggested to a juror that the juror could profit by bringing in a verdict favorable to the defendant. After investigation, the prosecutor and the trial judge determined that the remark had been made in jest and could therefore be ignored. Contrarily, the Supreme Court held that, under [**20] the circumstances, the remark had to be deemed presumptively prejudicial to the defendant and that he was entitled to a hearing to determine if, in fact, he had been prejudiced by the contact. *Id. at 229-230*. Here, by contrast, the trial judge conducted an appropriate hearing, taking the additional step of requiring the defendant's other attorney to appear and testify. After hearing, the trial judge determined that both the juror and Fox were credible, and that the juror remained impartial and unbiased.

"The constitutional standard of fairness requires only that the [*581] jurors be impartial and indifferent." *Commonwealth v. Daughtry, 417 Mass. 136, 147, 627 N.E.2d 928 (1994)*, quoting from *Commonwealth v. Jackson, 376 Mass. 790, 799, 383 N.E.2d 835 (1978)*. "Juror bias is a question of fact to be determined by the judge. A finding that a juror is impartial will not be overturned on appeal unless the defendant makes a clear showing of abuse of discretion or that the finding was

59 Mass. App. Ct. 571, *; 797 N.E.2d 394;
2003 Mass. App. LEXIS 1096, **

clearly erroneous." *Commonwealth v. Emerson, 430 Mass. 378, 384, 719 N.E.2d 494 (1999)*, cert. denied, *529 U.S. 1030, 146 L. Ed. 2d 333, 120 S. Ct. 1446 (2000)*. [**21] In part, a judge's determination of impartiality rests on her determination of the credibility of those testifying. "The determination of a juror's impartiality 'is essentially one of credibility, and therefore largely one of demeanor' . . . . In such circumstances, we give a trial judge's determination of impartiality great deference." *Commonwealth v. Ferguson, 425 Mass. 349, 352-353, 680 N.E.2d 1166 (1997)*, quoting from *Patton v. Yount, 467 U.S. 1025, 1038, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984)*. As well, the mere fact that a juror knows a police officer or prosecutor, or is related to them, does not disqualify a juror from service or show any bias. See *Commonwealth v. Duran, 435 Mass. 97, 106-107, 755 N.E.2d 260 (2001)* (fact that juror was a correctional officer where the defendant held did not create a presumption of bias). The trial court's finding here was not clearly erroneous, nor was there an abuse of discretion. Even though the contact may have given rise to a high probability of prejudice, the trial judge's appropriate hearing, coupled with her detailed findings, satisfies us that, as the trial judge found, this probability [**22] did not manifest in any actual prejudice.

The indictments. The defendant's final contention, that the grand jury improperly issued indictments charging the defendant with larceny over $ 250 and fraudulent use of a credit card, is without merit. Our review of the record suggests that the evidence provided by Sergeant DiDomenica, the Commonwealth's sole witness, was sufficient to identify the defendant as the person involved in each crime, and to justify a reasonable person's conclusion that the defendant used the accounts to buy items and that he intended to do so. The receipts offered reflect that he obtained the goods listed in them. We generally will not review the sufficiency or competency of the evidence before a grand jury. See *Commonwealth v. Lawrence, 404 Mass. 378, 384, 536 N.E.2d 571 (1989)*. We have, rarely, departed from the rule where there [*582] was insufficient evidence to establish the identity of the accused or probable cause to arrest him, or where the integrity of the grand jury process was impaired. See ibid.; *Commonwealth v. Arias, 29 Mass. App. Ct. 613, 616, 563 N.E.2d 1379 (1990), S.C., 410 Mass. 1005, 572 N.E.2d 553 (1991)*. [**23]   To invoke these rare exceptions, the defendant bears the burden of showing that the evidence presented (1) was given with knowledge that it was false and deceptive; (2) was given with the intention of obtaining an indictment; and (3) must probably have influenced the grand jury's determination to hand up an indictment. *Commonwealth v. Pond, 24 Mass. App. Ct. 546, 551, 510 N.E.2d 783 (1987)*. We conclude that the defendant has failed to show the existence of any of these elements.

Judgments affirmed.

**Supreme Judicial Court for the Commonwealth of Massachusetts**
**One Beacon Street, Third Floor, Boston, Massachusetts 02108**
**(617) 557-1020**


Angela G. Lehman, Esquire
250 Main Street
Charlestown, MA 02129


RE:   Docket No. FAR-13790

**COMMONWEALTH**
      **vs.**
**JOHN D. MURPHY**

          Middlesex Superior Court No. MICR1998-00613
          A.C. No. 2001-P-0592

              NOTICE OF DENIAL OF F.A.R. APPLICATION

        Please take note that on 12/29/03, the above-

captioned Application for Further Appellate Review was denied.


                          Susan Mellen, Clerk


Dated: December 29, 2003

To:   James W. Sahakian, A.D.A.
      Angela G. Lehman, Esquire

*62.*

VOLUME: I
PAGES: 110
Exhibits: None

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT DEPARTMENT
                                 OF THE TRIAL COURT
                                 DOCKET NO. 98-613

COMMONWEALTH

v.

JOHN D. MURPHY

TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Before:  Hamlin, J.
and a jury.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

                                 Tuesday, October 10, 2000
                                 Middlesex Superior Court
                                 40 Thorndike Street
                                 East Cambridge, MA 02141

APPEARANCES:

     Lincoln Jalelian, Assistant District Attorney
                    For the Commonwealth

     Aviva Jeruchim, Esq.
                    For the defendant

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

APR 3 0 2001

CLERK

          LISA M. NAPOLITANO, OFFICIAL COURT REPORTER

103

1      BENCH CONFERENCE AS FOLLOWS:

2                   THE COURT:  How are you, sir?

3                   THE CLERK:  Tell the Judge your

4          name.

5                   JUROR NUMBER 11-5:  Scott Offen.

6                   THE COURT:  What can I do for you,

7          sir?

8                   JUROR NUMBER 11-5:  I just wanted

9          to bring to your attention that my father-

10         in-law was a former U.S. Assistant Attorney,

11         and my cousin is a police officer.  I don't

12         think that means I can't be impartial, but I

13         thought I would tell you.

14                  THE COURT:  All right.  That was

15         going to be my question to you.  Would

16         either of those circumstances interfere with

17         your ability to be fair and impartial?

18                  JUROR NUMBER 11-5:  No, no.  I have

19         one other thing to tell you.  There is a

20         scheduling issue for religious regions.  I

21         just need to get home by five o'clock on

22         Fridays.  Do you think that would be

23         possible?

24                  THE COURT:  We would be stopping.

104

1          How long does it take you to get home?

2                    JUROR NUMBER 11-5:  About a half

3          and hour.

4                    THE COURT:  That should be fine

5          because we typically stop at four.

6                    JUROR NUMBER 11-5:  Oh, that's

7          great.  Okay.

8                    THE COURT:  Not excused.

9                    THE CLERK:  Not excused.

10

11    END OF BENCH CONFERENCE

12

13                   THE CLERK:  11-3, David Parrott.

14                   JUROR NUMBER 11-3:  Here.

15                   THE CLERK:  Please take seat number

16         10.

17                   And Scott Offen, 11-5.

18                   JUROR NUMBER 11-5:  Here.

19                   THE CLERK:  Seat number 11.

20

21    BENCH CONFERENCE AS FOLLOWS:

22                   THE COURT:  I'm going to ask

23         counsel to just go back and just challenge

24         anyone they don't want in this group.  Take

62.

VOLUME:  V
PAGES:  159
EXHIBITS:  See index

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT DEPARTMENT
                                 OF THE TRIAL COURT
                                 DOCKET NO. 98-613

COMMONWEALTH

v.

JOHN D. MURPHY

TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
        Before:  Hamlin, J.
                 and a jury
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

                                 Monday, October 16, 2000
                                 Middlesex Superior Court
                                 40 Thorndike Street
                                 East Cambridge, MA 02141

APPEARANCES:

        Lincoln Jalelian, Assistant District Attorney
                    For the Commonwealth

        Aviva Jeruchim, Esq.
                    For the defendant

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
FOR THE COUNTY OF MIDDLESEX

APR 3 0 2001

Edward J. Sullivan
CLERK

        ------------------------------

        LISA M. NAPOLITANO, OFFICIAL COURT REPORTER

3

Monday, October 16, 2000

(10:20 a.m.)

(Without jury.)

THE COURT:  Counsel, there are a
couple of issues.  Juror Number 1 has
telephoned and informed the court officers
that she fell over the weekend and broke her
shoulder, and she is presently in the
hospital.  She has fractured her shoulder.
She isn't in the hospital, but she is going
to a bone specialist today, and is not sure
when she will be available.  So that is
issue number one.  And obviously, we can get
a report.  But I don't know whether she will
be available or not.  We will have to check
into it and see.

Juror Number 11 has indicated that
he wishes to speak to the Court about
something.  So, if you could bring him in,
and I will ask him what it is he wishes to
say to the Court.

And then after we hear what he has
to say, I'll see counsel at the side bar and

4

1        see if there are any follow-up questions.

2

3        (Juror Number 11 enters the courtroom.)

4                THE COURT:  Good morning, sir.

5                JUROR NUMBER 11:  Good morning.

6                THE COURT:  Obviously, we know who

7        you are.  But could you just state your name

8        for the record.

9                JUROR NUMBER 11:  Sure.  Scott

10       Offen, O-f-f-e-n.

11               THE COURT:  And you are presently a

12       juror in this case?

13               JUROR NUMBER 11:  Yes, I am, Juror

14       Number 11.

15               THE COURT:  You indicated that you

16       wanted to see the Court about something.

17       Can you just let me know what that is?

18               JUROR NUMBER 11:  Sure.  I am very

19       sorry this happened, Your Honor, really.  I

20       took your charge very seriously.  But I was

21       at a social occasion, and somebody let out

22       that they knew that the defendant had

23       another criminal proceeding before the

24       Court.

5

1          THE COURT:  Can you tell me to the

2     best of your memory, exactly what was said?

3          JUROR NUMBER 11:  You know what, I

4     can give you a blow-by-blow description, if

5     you'd like to have it.

6          THE COURT:  Yes, I would.

7          JUROR NUMBER 11:  So, this person

8     said, "Hi, How are you?"  I said, "I'm

9     Okay."  And he said -- I work in the stock

10    market.  He said, "How have you been this

11    week with the stock market the way it is?"

12    I said, "Well, thank God that I'm on a jury.

13    I haven't had to hear anything.  I haven't

14    had to deal with what's going on."  And he

15    said, "What kind of a case are you on?"  And

16    I said, "Well, it is a criminal case."  And

17    he said, "Who is the Judge?"  And 1 said,--

18    "Judge" -- I don't even remember your name

19    anymore.

20         THE COURT:  Hamlin.

21         JUROR NUMBER 11:  "Judge Hamlin."

22         THE COURT:  All right.  But did you

23    remember it at the time?

24         JUROR NUMBER 11:  Yes.  I did

6

1    remember your name at the time.  I'm sorry,

2    Your Honor.

3              THE COURT:  No, that's all right.

4              JUROR NUMBER 11:  I said, "Judge

5    Hamlin."  And he said, "Oh, that's the John

6    Murphy case.  He's got another one too."

7              THE COURT:  "He's got another one

8    too"?

9              JUROR NUMBER 11:  Right.  So, I

10   don't know what that really means.  But I

11   assumed it meant that he had another -- I

12   think it was reasonable to infer that he

13   meant another -- I happen to know a lot of

14   law enforcement people, unfortunately, and I

15   think it was just reasonable to assume that

16   he meant another -- maybe he said, "He's got

17   another case too."  I'm trying to remember

18   the exact words.

19             THE COURT:  All right.  What did

20   you think it meant?

21             JUROR NUMBER 11:  Well, I thought

22   it meant that he had another case, another

23   court case too.

24             THE COURT:  Other than what you've

7

1    related, was there any further conversation?

2                 JUROR NUMBER 11:  No, there was no

3         further conversation.

4                 THE COURT:  And have you mentioned

5         or have you said anything at all about this

6         to any of the other jurors?

7                 JUROR NUMBER 11:  Absolutely not.

8                 THE COURT:  Let me see counsel over

9         here at the side

10        bar.

11        BENCH CONFERENCE AS FOLLOWS:

12                 THE COURT:  I'm obviously going to,

13        at some point, ask him, will that interfere

14        with his ability to be fair and impartial?

15        But are there other questions that counsel

16        would want the Court to ask him about the

17        situation?

18                 MS. JERUCHIM:  No, there are not.

19                 MR. JALELIAN:  No.

20                 THE COURT:  So, what I'll do is ask

21        him whether he could be a fair and impartial

22        juror, and then I'll excuse him and we will

23        see where everybody's thoughts are.

24   END OF BENCH CONFERENCE

8

1         THE COURT:  Let me ask you, sir,

2    based upon having had that conversation, do

3    you feel that you could be a fair and

4    impartial juror and decide this case based

5    only on the evidence in this case

6    irrespective of anything beyond this case?

7         JUROR NUMBER 11:  Absolutely.  I

8    think it is completely irrelevant to this

9    matter at hand.  And in this country, you're

10   innocent until proven guilty.  And it is

11   completely irrelevant as far as I'm

12   concerned.

13        And I only mentioned it because I

14   thought the defendant was entitled to have,

15   you know, the best, fairest hearing

16   possible, which is why I wanted to bring it

17   up to everybody's attention.  It has no

18   impact on me whatsoever.

19        THE COURT:  Thank you, sir.  So,

20   why don't I excuse you.  And obviously don't

21   mention anything.  Don't say a word about

22   this to any of the other jurors.

23        JUROR NUMBER 11:  I promise.

24   (Whereupon, Juror Number 11 leaves courtroom.)

9

1           THE COURT:  All right.  Now, did

2       counsel want me to take a recess so that you

3       can think about what you want to say to the

4       Court on the issue?

5           MR. JALELIAN:  No.  Thank you,

6       unless the Court wants to.

7           THE COURT:  Do you want to have

8       time to talk to your client, counsel?

9           MS. JERUCHIM:  I would like that,

10      Your Honor.

11          THE COURT:  And in the meantime,

12      obviously we now have thirteen jurors.

13          THE CLERK:  We have twelve now.

14          THE COURT:  But I mean if I don't

15      excuse -- I haven't yet excused the lady

16      with the shoulder because I'm not sure.  She

17      is a nurse and before I would excuse her

18      formally based on the situation here, I

19      think I'd want to try to find out if it was

20      at all possible for her to come.

21          We will take a recess.

22  (10:30 a.m.)        (Recess.)

23

24                    *

10

1    (10:40 a.m.)

2    (Without jury.)

3                THE COURT:  All right.  I asked our

4          clerk to call Juror Number 1 to ascertain

5          her status.  She is a licensed practical

6          nurse so presumably has more information

7          then the average person about the situation.

8                She reports that she is in pain and

9          is unable even to dress herself.  She cannot

10         drive, and she has to see a bone specialist

11         today at three o'clock and feels that she

12         would not be able to come even if we

13         recessed the trial of this case for a day or

14         two because of the pain that she is in and

15         because of her circumstances, she doesn't

16         feel that she would be able to dress or sit

17         and would undoubtedly be on some pain

18         medication.

19                Do either counsel object if the

20         Court excuses her from service in the case?

21                MS. JERUCHIM:  No.

22                MR. JALELIAN:  No, Your Honor.

23                THE COURT:  All right.  And I don't

24         think I have any choice based on her medical

11

1  situation.

2  All right.  What does the defendant

3  say about the issue of Juror Number 11?

4  MS. JERUCHIM:  Your Honor, we're

5  satisfied that he is impartial.  I would

6  just ask the Court perhaps to give some kind

7  of an instruction to the jury.  I would

8  imagine that, you know, whatever the scope

9  of the conversation that is --

10  THE COURT:  They don't know

11  anything about it.

12  MS. JERUCHIM:  Right.

13  THE COURT:  None of the other

14  jurors have heard a word about it.  If that

15  were the case, I'd have to talk to each one

16  of them individually.  But he has not

17  mentioned it to any of the other jurors.

18  And I believe him when he says he has not.

19  MS. JERUCHIM:  I agree, Your Honor.

20  Actually, what I was saying was that I would

21  just ask an instruction to him, himself,

22  that he not consider that conversation as

23  evidence and of course can not have any

24  discussion about it with the jury, and that

12

1       it is not to have any effect on your

2       deliberations or on the verdict.

3                  THE COURT:  All right.  If you

4       would stand up, Mr. Murphy.  You've heard

5       what your lawyer just said concerning the

6       issue of Juror Number 11?

7                  THE DEFENDANT:  Yes, Your Honor.

8                  THE COURT:  Is it your wish that we

9       continue and have this juror remain on the

10      jury?

11                 THE DEFENDANT:  Yes, Your Honor.

12                 THE COURT:  And you've talked about

13      it with your counsel?

14                 THE DEFENDANT:  Yes.

15                 THE COURT:  All right.  Thank you.

16      You may sit down.

17                 What does the Commonwealth say?

18                 MR. JALELIAN:  That's fine, Your

19      Honor, to keep this juror.  I don't think

20      there is a necessity to do any further

21      instruction or communication with him.  He

22      was very clear that he hasn't told anybody,

23      he won't tell anybody, and it won't affect

24      him.

13

```
 1            THE COURT:  All right.  But out of
 2      an excess of caution, I'm going to have him
 3      come back.
 4            Stand up again, Mr. Murphy, for a
 5      minute.  You understand that you have no
 6      right to have any appellate issue about this
 7      juror.  This is your chance to address the
 8      Court on this issue whether you want him to
 9      stay or go.  Do you understand that?
10            THE DEFENDANT:  Yes, Your Honor.
11            THE COURT:  And you want him to
12      stay?
13            THE DEFENDANT:  Please.
14            THE COURT:  All right.  You may sit
15      down.
16
17      (Juror Number 11 enters courtroom.)
18            THE COURT:  Good morning, again, if
19      you would sit down.
20            JUROR NUMBER 11:  Good morning.
21            THE COURT:  Sir, the Court found,
22      based upon what you said, that you can be a
23      fair and impartial juror.  So, I'm going to
24      have you continue on the case.
```

14

1          I just wanted to say to you that

2      obviously if at any time you felt that what

3      you heard was of concern as to whether you

4      could be fair and impartial, you'd have to

5      let the court officer know and come back and

6      see me again.

7          JUROR NUMBER 11:   Okay.

8      Absolutely, Your Honor.

9          THE COURT:   But it is your state of

10      mind now that you can be a fair and

11      impartial juror and put out of your mind

12      that conversation and decide this case based

13      solely on the evidence in this case?

14          JUROR NUMBER 11:   Absolutely, Your

15      Honor.

16          THE COURT:   All right.   Thank you,

17      sir.   You may step down.   And again, don't

18      discuss it with any of the other jurors.

19          JUROR NUMBER 11:   I promise.

20          THE COURT:   All right.   I'm going

21      to find the juror remains fair and impartial

22      and can continue in this case.   And I'm

23      going to find that the defendant wishes him

24      to continue after due consultation with

15

1       counsel and understands he has no appellate

2       rights in this issue should there be a

3       verdict against him in this case.

4               All right.  Let me ask the

5       Commonwealth, is the handwriting expert

6       prepared to testify, referring specifically

7       to the exhibits?

8               MR. JALELIAN:  Yes.

9               THE COURT:  All right.  Anything

10      more that counsel want to say before we

11      continue with the trial.  Do you want to be

12      heard, counsel?

13              MS. JERUCHIM:  Yes, Your Honor.  I

14      have a specific issue that I need to address

15      before the trial.  I'd just ask at this time

16      that the expert be --

17              THE COURT:  Yes.  The witnesses are

18      sequestered.  So, she will have to wait

19      outside.

20              MS. JERUCHIM:  Thank you.  With

21      regards to my previous objections regarding

22      the witness' testimony, I am at this time

23      moving to exclude and strike the use of

24      ninety percent of these standards of

62.

```
                         VOLUME:  VI
                         PAGES:   123
                         EXHIBITS:  See index
```

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT DEPARTMENT
                                  OF THE TRIAL COURT
                                  DOCKET NO. 98-613

COMMONWEALTH

v.

JOHN D. MURPHY

TRIAL

```
* * * * * * * * * * * * * * * * * * * * * * * *
            Before:  Hamlin, J.
                     and a jury.
* * * * * * * * * * * * * * * * * * * * * * * *
```

```
                         Tuesday, October 17, 2000
                         Middlesex Superior Court
                         40 Thorndike Street
                         East Cambridge, MA 02141
```

APPEARANCES:

    Lincoln Jalelian, Assistant District Attorney
                  For the Commonwealth

    Silva Jeruchim, Esq.
                  For the defendant

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
the The County of Middlesex

APR 3 0 2001

CLERK

    ---------------------------------

    NAPOLITANO, OFFICIAL COURT REPORTER

73

1    else here who I thought was another clerk,

2    and I asked him, I said, "I need to speak

3    to --"

4              THE COURT:  All right.  But you can

5    ask Steve.

6              MS. JERUCHIM:  I didn't know.  I'm

7    sorry.  I was attempting to do that.

8              THE COURT:  All right.  What is it?

9              MS. JERUCHIM:  I have a huge issue

10   that just came to my attention during the

11   break.  I went out to speak with my client,

12   and we were out in 6B.  And it is a matter

13   that has to do with the issue of the juror

14   yesterday, and I don't know if you want me

15   to discuss it.

16             THE COURT:  Are you saying,

17   counsel, that you had them bring the jury

18   out, and your have an issue with a juror?

19             MS. JERUCHIM:  That's why I'm

20   trying to ask the Court --

21             THE COURT:  All right.  What do you

22   want to ask me about the juror?

23             MS. JERUCHIM:  I spoke with Mr.

24   Jalelian about it.  My client obtained

74

1        additional information that he just brought

2        to my attention about that exchange that was

3        discussed which exceeded this --

4              THE COURT:  All right.  How did he

5        obtain that information?  He is in custody.

6              MS. JERUCHIM:  The individual in

7        question with whom the juror had the

8        conversation is my client's Suffolk defense

9        attorney.  And last night, my client

10       contacted his Suffolk defense attorney to

11       discuss the case --

12             THE COURT:  What is the name of the

13       Suffolk defense attorney?

14             MS. JERUCHIM:  I believe his name

15       is John Fox.

16             MR. JALELIAN:  Robert Fox.

17             MS. JERUCHIM:  Robert Fox.  Thank

18       you.  And he contacted Mr. Fox approximately

19       at seven o'clock last night, and he had a

20       conversation with him generally about his

21       case and then confronted him on the issue of

22       whether or not he was the one who had the

23       discussion.  Mr. Fox admitted that he was.

24             And when he had the discussion with

75

1          him, my client asked him, "What conversation

2          transpired?"  And Mr. Fox told my client

3          that he did tell the juror that he was a

4          criminal defense attorney representing Mr.

5          Murphy is Suffolk matters on another

6          criminal case.

7                    THE COURT:  All right.  Well, what

8          we're going to do, counsel, is you can put

9          on your case.  And I will deal with this

10         matter after you have put on your evidence.

11

12    END OF BENCH CONFERENCE

13

14                   THE COURT:  All right.  You may

15         proceed, counsel.

16                   MS. JERUCHIM:  May I call my first

17         witness, please?

18                   THE COURT:  Yes.

19                   MS. JERUCHIM:  Joan Culliton.

20

21    JOAN E. CULLITON, SWORN

22    DIRECT EXAMINATION BY MS. JERUCHIM:

23    Q    Good morning.

24    A    Good morning.

88

1       complete.  I'm going to excuse you briefly

2       and ask that you remain until the Court

3       excuses you.

4

5       (12:15 p.m.)        (Jury out.)

6                  THE COURT:  All right.  Counsel,

7       before you called your witness, you asked to

8       approach the bench on an issue concerning a

9       juror.

10                 What I want to ask you is when did

11      you find out from your client?  I am

12      concerned that it is now 12:15, and I've

13      just been informed of this.  When did you

14      find out from your client about this

15      purported conversation with Mr. Fox, his

16      attorney in Suffolk?

17                 MS. JERUCHIM:  Your Honor, as I

18      indicated to you, when we went over -- when

19      I went over just in the morning recess

20      before I -- before we reconvened.  And

21      again, I'll specifically tell you what I

22      did.

23                 My client was brought into lock-up.

24      I went in and spoke to him.  And this

89

1        morning when we were speaking, I was

2        discussing the case law that I had pulled

3        and all the issues that went on this morning

4        and in the heat of it, I never brought up

5        the issue of the juror and had no reason to.

6        And when we went back there, we began to

7        just discuss matters generally.  And he

8        said, "By the way, I found out who the

9        person was who made this conversation," and

10       told me essentially what I told you at side

11       bar.

12                THE COURT:  And you're going to

13       have to repeat in, counsel.

14                MS. JERUCHIM:  All right.  He

15       confronted -- last night at seven o'clock,

16       he called his attorney, Robert Fox, who

17       represents him on Suffolk in ictments on

18       matters in general.

19                And in part of the conversation, my

20       client confronted Mr. Fox and asked him if

21       was the one who had the conversation with

22       the juror, and Mr. Fox responded in the

23       affirmative.

24                THE COURT:  What in the world would

90

1    make him think that it was lawyer that had

2    the conversation?

3            MS. JERUCHIM:  Because he couldn't

4    think of anybody -- I'm sorry, Your Honor,

5    let me be precise because there is

6    information that I left out, and I'm sorry.

7            THE COURT:  All right.  I want you

8    to be absolutely precise about this issue so

9    that I can determine how to handle it.

10           MS. JERUCHIM:  Okay.  My client

11   called Mr. Fox, as part of attorney/client

12   conversations.  And within the context of

13   the client conversation, Mr. Fox said to my

14   client, "Was that juror on your trial

15   excused?"  And that was what alerted my

16   client to the fact that Mr. Fox must have

17   been the one who engaged in the

18   conversation.  I'm sorry, Your Honor, I

19   omitted that part.  I had forgotten.

20           THE COURT:  And as I don't know Mr.

21   Fox, my I assume that he is an attorney and

22   an officer of the court?

23           MS. JERUCHIM:  I believe that he

24   is, Your Honor.  And he represents my client

91

1    in Suffolk Superior Court on criminal

2    matters, actually almost identical

3    indictments.  And my client asked Mr. Fox

4    what they discussed, and Mr. Fox said that

5    he asked the juror if in fact he was on Mr.

6    Murphy's case.  That part of the

7    conversation was accurate.

8         But then Mr. Fox went on to state

9    that he was my client's criminal defense

10    attorney representing him in Suffolk

11    Superior criminal matters.

12         THE COURT:  So, you're telling me

13    that a lawyer, an officer of the court,

14    knowing that an individual is a deliberating

15    juror, informed him of other pending

16    criminal charges against this defendant?

17              MS. JERUCHIM:  Yes.

18         THE COURT:  That's what you're

19    saying that this defendant says that his

20    lawyer told him?

21         MS. JERUCHIM:  That's correct, Your

22    Honor.  And when my client gave me this

23    information, I came out and immediately saw

24    Mr. Jalelian and told him that this issue

92

1          had arisen.  And after that, I came in and

2          looked for Mr. McDade to inform him that I

3          needed to address you before the jury came

4          in.

5                    THE COURT:  All right.  Well,

6          that's a side issue now, counsel.  We've

7          taken care of that.

8                    MS. JERUCHIM:  I'm just letting you

9          know.

10                   THE COURT:  But you can speak to

11         any court officer or anybody and say, "I

12         need to see the Court before the jurors are

13         brought in."  Obviously the court officer is

14         the person most likely to talk to since he

15         is the one I would be telling to bring in

16         the jury.

17                   All right.  What are you asking me

18         . to do, counsel?

19                   MS. JERUCHIM:  I feel at this

20         point, that I have no choice unfortunately

21         but to move for a mistrial since I cannot --

22                   THE COURT:  How do you say the

23         situation has changed other than what the

24         juror said?

1        MS. JERUCHIM:  Well, what the juror

2    said was basically that he had a

3    conversation with an individual who remained

4    unnamed and said that he was -- that

5    individual said that my client has other

6    matters pending in another court, another

7    matter pending in another court.  It wasn't

8    specifically identified as a criminal

9    matter, which I believe now changes the

10   situation completely.

11       And as much as I would like to

12   believe that this juror would remain

13   impartial, I can't now advise my client in

14   the same way that I did yesterday morning

15   when that information came to light.  Had I

16   known about that additional information,

17   then I would have advised my client

18   differently.  And then my client also tells

19   me that now that he knows that information,

20   he doesn't feel -- he can no longer believe

21   that this jury, regardless of whatever this

22   juror might say, would remain impartial.

23       THE COURT:  What additional

24   information do you say changes the

94

1    situation?

2              MS. JERUCHIM:  That this individual

3         was apprised of the fact that my client had

4         essentially criminal matters pending,

5         similar criminal matters pending in another

6         court.

7              THE COURT:  All right.  Well I'll

8         just say for the record, counsel, that based

9         on what that juror said yesterday, he had

10        drawn that conclusion.  And it was clear to

11        the Court he had drawn that conclusion based

12        upon what was said.  And in spite of that,

13        he indicated he could remain impartial.

14             MS. JERUCHIM:  I understand, Your

15        Honor.  But you asked that juror the full

16        text of the conversation, and that juror

17        failed to include that the person with whom

18        the juror was having the conversation with

19        is my client's criminal attorney, and he

20        identified himself as such, which actually

21        if you consider a conversation between two

22        people, it would be logical in the context

23        of how the person making a claim that my

24        client has other matters, how they would

95

1    know that.

2            So it seems logical, at least from

3    my perspective -- and of course, Your Honor,

4    I wasn't there as part of this conversation

5    between my client and his Suffolk attorney.

6    But it seems that in the context of that

7    type of communication, the statement that,

8    "Yes, I am representing him.  I am his

9    criminal attorney representing him on

10   criminal matters," might seem to make sense

11   in light of the conversation.

12           And frankly, Your Honor, when that

13   juror was telling this narrative, it seemed

14   a little bit incomplete but because he came

15   to you and narrated the full course of the

16   conversation, I didn't feel that I had a

17   place to inquire as to the credibility of

18   the context of that conversation.

19           THE COURT:  All right.  You had the

20   opportunity to suggest any questions to the

21   Court or to say anything you wished,

22   counsel, concerning that juror.

23           MS. JERUCHIM:  Your Honor, I did.

24   But again, I'm put in a difficult position.

96

1    You asked the juror, what exactly took

2    place, what conversation took place between

3    those two people?  He in effect --

4           THE COURT:  What he could remember.

5    I asked him what he remembered about what

6    was said.

7           MS. JERUCHIM:  Well, what was told

8    to me at least, representing my client,

9    omitted this information.

10          THE COURT:  Have you talked to Mr.

11   Fox?

12          MS. JERUCHIM:  No.  I just found

13   this information out.  And the final part of

14   the conversation, I think, was my client

15   suggested to Mr. Fox that his conduct was

16   unprofessional, and Mr. Fox did not respond,

17   he declined to comment.  That is the full

18   conversation.  And frankly, Your Honor, I

19   feel uncomfortable.  I am now being put into

20   the position to question another attorney's

21   conduct, ethical conduct.

22          Clearly, a conversation took place.

23   And it really frankly makes sense that Mr.

24   Fox may have been the one to say that

97

1    because after all, in our small world, how

2    many people know that Mr. Murphy is on

3    trial.

4              THE COURT:  Well, anybody in this

5    courthouse knows.  There is plenty of police

6    and other lawyers in this courthouse as

7    well.  So, it doesn't focus on him

8    necessarily.

9              So, you're asking for what,

10   counsel?

11             MS. JERUCHIM:  I'm moving for a

12   mistrial, reluctantly, I might add, but

13   necessarily so.

14             THE COURT:  And your client told

15   you this after the Court had denied the

16   motions for directed finding?

17             MS. JERUCHIM:  He denied it at the

18   recess -- yes, he told me that, what I told

19   you, Your Honor.

20             THE COURT:  In other words, it was

21   after we recessed, after the Court had

22   denied the motion for directed finding?

23             MS. JERUCHIM:  Yes.  And he went

24   back, and I discussed this with him.

98

1              THE COURT:  All right.  What does

2         the Commonwealth say?

3              MR. JALELIAN:  Just briefly, Your

4         Honor, I think you have to look at what has

5         changed from yesterday to today.  And again,

6         you're going to evaluate the credibility of

7         a neutral and detached juror and his version

8         of what he said happened.  And more

9         importantly that he said it has no effect on

10        him.  He was very firm and very specific.

11        And I believe he used the words,

12        "Absolutely, it has no effect on me."

13        Weigh that against an eleventh hour

14        assertion by a defendant, not under oath,

15        who has just had the required findings

16        denied.  And I think you can use the factual

17        analysis and weigh the credibility, or you

18        can just jump to the legal analysis, and

19        this juror had indicated clearly, forcibly

20        and repeatedly that that conversation has

21        absolutely no effect on his ability to be a

22        juror.

23             The only thing that has changed is

24        now the defendant has interjected a

99

1      conversation, that may or may not have

2      happened, into the mix and is engineering

3      this trial frankly because I don't think he

4      happy with the way the case is going. It

5      puts Ms. Jeruchim in a difficult position,

6      but it doesn't put the defendant in a

7      difficult position. And the information is

8      coming from the defendant unsworn and self-

9      serving.

10            MS. JERUCHIM: Your Honor, if I may

11     again, just comment on something.

12            THE COURT: Yes.

13            MS. JERUCHIM: Again, I'd still

14     like to think that even in the context of

15     this trial, that my client still has a

16     presumption of innocence.

17            THE COURT: That has nothing to do

18     with what counsel just said.

19            MS. JERUCHIM: That is absolutely

20     correct. But what I am saying to you is,

21     consider what it was that this juror said

22     and I understand that you said that anybody

23     in this courtroom or in this entire

24     courthouse could know that my client is on

1    trial, that may be true.  But how many

2    people know that my client is also on trial

3    in another court.  I would say that that

4    breaks down the population who could make

5    that claim, so a very, very small and narrow

6    population.

7         And I would say, who else but his

8    attorney would have privy to that

9    information, really it is not an illogical

10   leap, Your Honor, at all, unfortunately.

11        THE COURT:  No.  But the source of

12   it is not as of concern to me, counsel -- it

13   is of concern to me.  But as far as what I

14   have to do here with this case, I don't see

15   how I've heard anything different from you

16   than the juror related other than a few

17   words here and there.  But it is quite

18   obvious he drew the conclusion that there

19   were other criminal matters pending

20   elsewhere.

21        MS. JERUCHIM:  Your Honor, he in

22   fact never -- and maybe I am misspeaking

23   what this juror said.  If this juror had

24   said that he knew that it was a criminal

1    matter, that he heard that it was a criminal

2    matter or inferred that it was a criminal

3    matter, my advice to my client yesterday

4    would have been different, but he did not

5    say that. He said specifically, "another

6    matter," no other words. Clearly, Your

7    Honor, "another matter," could definitely be

8    a civil matter. And I was willing, given

9    that it was left open, that I was going to

10   allow that juror to believe that it was a

11   civil matter.

12            However, this is not the

13   information that I've gotten, that my client

14   one, is represented by a criminal defense

15   attorney on similar charges, and that

16   information was given to that juror.

17            THE COURT: All right. But that's

18   what your client has said.

19            MS. JERUCHIM: That's right.

20   That's what my client said.

21            THE COURT: You haven't spoken to

22   Mr. Fox.

23            MS. JERUCHIM: Right. And frankly,

24   Your Honor, given the seriousness of this

102

1          matter, I'm going to question that whether

2          Mr. Fox is going to even want to admit

3          making these statements.

4                    THE COURT:  Well, if he is an

5          officer of the court and he comes to

6          testify, if he lies under oath, he will have

7          a problem.

8                    I'm going to take the recess.  We

9          are going to resume at two o'clock.

10     (12:30 p.m.)        (Recess.)

11

12                         *

13

14                    AFTERNOON SESSION

15     (2:15 p.m.)        (Jury in.)

16                    THE COURT:  Good afternoon, members

17          of the jury.  Let me ask the jurors, did you

18          obey all the instructions of the Court?

19                    I'll note the jurors obeyed the

20          instructions of the Court.

21                    Now counsel and the Court, as I

22          told you, counsel have submitted written

23          request for jury instructions; in other

24          words, written requests about what they want

103

1    me to say about the law.  Some of it is

2    pretty standard, but we are required by the

3    criminal rules to have a charge conference

4    meeting, which takes time.  And then counsel

5    would be addressing you in closing argument,

6    and the Court will be charging you on the

7    law.  And even in the average case, just to

8    cover the basic law will be some forty

9    minutes or so.

10              And what happens is I found that it

11   isn't fair for you really for you to wait

12   and then we do this, and then it might be

13   four-thirty or five o'clock and you're

14   tired.  So, I don't want to do that.  You've

15   been listening carefully throughout the

16   course of this trial, including today.

17              So I'm going to ask you to come

18   back tomorrow morning at ten o'clock at

19   which time, we will have the closing

20   arguments and the charge.

21              And I will remind you, as I know

22   you are aware of all the instructions of the

23   Court, don't talk to anyone about the case.

24   Don't let anybody talk to you.  If anyone

104

1    attempts to discuss the case with you, cut

2    them off, don't talk to them about it, and

3    report it to the court officer in the

4    morning.

5              So, have a please evening.  And

6    have in mind that tomorrow, it may be that

7    you may wish to stay beyond four to

8    deliberate and again, that will be up to

9    you.

10              (Jury excused.)

11              THE COURT:  Before we do anything

12    further, I just want to put on the record

13    that I have been giving the matter as

14    reported to me by counsel of what the

15    defendant says he said with his lawyer a

16    great deal of thought, as I ought, it is my

17    responsibility to make sure that the

18    defendant has a fair trial and that the

19    jurors are fair and impartial.

20              I'm also concerned of the issue of

21    having it reported to me by anyone that a

22    lawyer spoke to a deliberating juror.

23              What I'm concerned about is in

24    reviewing my notes and on speaking to

105

1    defense counsel, I am not really sure what

2    it is that the defendant is claiming was

3    said to him by his lawyer or what he said to

4    the lawyer.

5         So I would like to have the

6    defendant tell me, not what he spoke about

7    other matters, but only what he and the

8    lawyer said about the juror.

9         So if you want to question him,

10   counsel.  I need to know exactly what he

11   says was said because that may or may not

12   have a concern.

13        So, can you swear him in, Bob?

14

15   JOHN D. MURPHY, SWORN

16        THE COURT:  Obviously, counsel, I

17   am concerned about the defendant getting a

18   fair trial, and I have to know the facts.

19   So, could you just ask him some questions so

20   that it is clear on the record because he

21   had the conversation.

22        MS. JERUCHIM:  Yes, Your Honor.

23        Could you state your name for the

24   record, please?

106

1           THE DEFENDANT:  John Derek Murphy.

2           MS. JERUCHIM:  And Mr. Murphy, last

3      night at approximately seven o'clock, where

4      were you?

5           THE DEFENDANT:  In the custody of

6      the Middlesex Sheriff's Department on the

7      18th floor.

8           MS. JERUCHIM:  And at some point,

9      did you make a phone call?

10          THE DEFENDANT:  I made numerous

11     calls to Mr. Fox, an attorney in Suffolk

12     Superior Court.

13          THE COURT:  Sir, could you speak up

14     a little.  It is hard to hear you.

15          What is the full name of your

16     lawyer?

17          THE DEFENDANT:  Robert E. Fox.

18          THE COURT:  All right.  And do you

19     know what his telephone number is?

20          THE DEFENDANT:  Area code 6-1-7

21     5-6-6  1-6-6-6.

22          MS. JERUCHIM:  And what is Mr.

23     Fox's office address if you know?

24          THE DEFENDANT:  358 Chestnut Hill

107

1      Ave., Brighton, Suite Number 205.

2                  MS. JERUCHIM:  And at some point,

3      did you reach Mr. Fox on the phone?

4                  THE DEFENDANT:  Yes, I did.

5                  MS. JERUCHIM:  And at approximately

6      what time did you reach him?

7                  THE DEFENDANT:  Around seven

8      o'clock.  Prior to that, his line was busy,

9      so I knew that he was in the office.

10                 MS. JERUCHIM:  And did you have a

11     conversation with him?

12                 THE DEFENDANT:  Yes, I did.

13                 MS. JERUCHIM:  And at some point,

14     did he say something to you which drew your

15     attention to the issues regarding the juror?

16                 THE DEFENDANT:  He mentioned that

17     he spoke to a juror in this case, and that

18     that juror was eliminated from my trial.

19                 THE COURT:  He said what?  I didn't

20     hear what you said.

21                 THE DEFENDANT:  He said that the

22     juror -- he said he ran across a juror that

23     was in this case, and that a juror was

24     eliminated from this case.

108

```
 1          THE COURT:  He said that a juror

 2     was eliminated from the case?

 3          THE DEFENDANT:  Yes.  And I

 4     informed him that the juror was not

 5     eliminated.

 6          MS. JERUCHIM:  And at that point,

 7     did you question him about the conversation

 8     with the juror?

 9          THE DEFENDANT:  I briefly did.  But

10     I know the telephones are recorded up there,

11     and an attorney call is not privileged.  And

12     I did advise him that I thought it was

13     unprofessional, and I wanted to talk to him

14     at a later time.  And he informed me that --

15     basically, he informed the juror that he was

16     my attorney on my criminal matter in Suffolk

17     Superio

18          THE COURT:  When you say,

19     "basically," did he say that?

20          THE DEFENDANT:  He informed the

21     juror that I was his client or he was my

22     attorney on Suffolk Superior matters,

23     similar to my charges here.

24          THE COURT:  All right.  Was
```

109

1       anything else said between you and counsel

2       about the issue of the case or the juror?

3               THE DEFENDANT: Meaning Fox

4       counsel?

5               THE COURT: Yes. About the issue

6       of the juror?

7               THE DEFENDANT: No, no.

8               THE COURT: All right. So, he said

9       to you, "The juror was eliminated in the

10      case"?

11              THE DEFENDANT: Yes. That was his

12      impression that I was going to have the

13      juror eliminated. I guess he was gonna --

14      as the juror did notify the Court, he

15      assumed that I was eliminating the juror.

16              THE COURT: And did you tell him

17      that you didn't want the juror eliminated?

18              THE DEFENDANT: I said, "No, I did

19      not eliminate the juror." At that time, he

20      told me that he informed him that he was my

21      attorney in Suffolk Superior Court.

22              THE COURT: And did he say the name

23      of the juror?

24              THE DEFENDANT: No, he did not.

110

1            THE COURT:  All right.  So, what

2       led you to believe it was the same juror?

3            THE DEFENDANT:  From the incident

4       that happened earlier in the day.

5            THE COURT:  Meaning what?

6            THE DEFENDANT:  Meaning the juror

7       brought it to your attention that he was

8       approached by somebody who knew that I had a

9       pending matter.

10           THE COURT:  All right.  Anything

11      else you want to ask him, counsel?

12           MS. JERUCHIM:  I just want to be

13      clear.  When you say he knew the juror was

14      eliminated, are you saying he knew he was

15      eliminated, or did he ask you whether or not

16      the juror was eliminated, or did he say it

17      in the sense of -- did he ask you as a --

18           THE DEFENDANT:  No.  He didn't ask.

19      He basically said that the juror -- I knew

20      that it happened over the weekend.  And he

21      said that that juror was -- he assumed that

22      that juror was going to be eliminated.

23           THE COURT:  All right.  You may

24      step down, sir.

111

1            All right.  What I have done is Mr.

2       Fox is being notified to come here tomorrow

3       unless he calls here today.  So I'm going to

4       ask counsel if we don't hear from him by the

5       time we finish the jury instructions,

6       hopefully, he will be here tomorrow.

7            Because I have two issues, I have

8       an issue about what the juror has told me

9       and if that is all the juror remembers, then

10      there is no problem.  But I need to have a

11      hearing to determine what the circumstances

12      are.  So, we cannot do that without Mr.

13      Fox.

14           All right.  Now counsel, you had a

15      motion for required finding of not guilty at

16      the close of all the evidence?

17              MS. JERUCHIM:  Yes, Your Honor.

18              THE COURT:  All right.  Do you want

19      to be heard, or do you adopt your prior

20      arguments?

21              MS. JERUCHIM:  Well, I'd adopt my

22      prior arguments.  The only thing that I

23      would add is as you heard, the Commonwealth

24      failed to produce any evidence as to the

*62.*

VOLUME:  VII
PAGES:  146
Exhibits:  See index

### COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                    SUPERIOR COURT DEPARTMENT
                                  OF THE TRIAL COURT
                                  DOCKET NO. 98-613

COMMONWEALTH

v.

JOHN D. MURPHY

### TRIAL

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
Before:  Hamlin, J.
and a jury.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Wednesday, October 18, 2000
Middlesex Superior Court
40 Thorndike Street
East Cambridge, MA 02141

APPEARANCES:

Lincoln Jalelian, Assistant District Attorney
For the Commonwealth

Aviva Jeruchim, Esq.
For the defendant

FILED
IN THE OFFICE OF THE
CLERK OF THE COURTS
the the county of middlesex

APR 3 0 2001

CLERK

LISA M. NAPOLITANO, OFFICIAL COURT REPORTER

3

1          P R O C E E D I N G S

2          Wednesday, October 18, 2000

3     (10:15 a.m.)    (Without jury.)

4               THE CLERK:  Good morning, Your

5          Honor.  Counsel and the defendant are

6          present, and Attorney Robert E. Fox is also

7          present.

8               THE COURT:  Thank you, Mr. Fox, for

9          coming.  Could you come forward, sir.  Could

10         you just state your name, please.

11              MR. FOX:  Robert D. Fox.

12              THE COURT:  Sir, I asked you to

13         come because there is an issue involving a

14         juror who is sitting on the case.  And your

15         client claims that there was a conversation

16         with a juror.  And I just wanted to ask you

17         if you could tell me what, if anything, you

18         know about this.

19              MR. FOX:  Yes.  One of my best

20         friends is on the jury.  I was in my synagog

21         on Friday night, and I bumped into him.

22         Usually he doesn't go to that synagog, but

23         he was there that night.

24              THE COURT:  And just for the

4

1    record, so we're sure we're talking about

2    the same person, what is his name?

3              MR. FOX:  Scott Offen.

4              THE COURT:  All right.

5              MR. FOX:  And he mentioned he was

6    on jury duty in this court before you.  And

7    I said something like, "You must have the

8    John Murphy case."  And he said, "How do you

9    know," I think something to that effect.

10   And I said, "I am representing him," and

11   then I said, "I probably said too much."

12   And I did ask him a general question about

13   what did he think of his experience so far.

14             THE COURT:  As a juror?

15             MR. FOX:  As a juror, yes.  And he

16   talked about the lawyers in the case.

17             THE COURT:  All right.  So that is

18   the extent of what you said to him.  "I am

19   representing him"?

20             MR. FOX:  Correct.

21             THE COURT:  All right.  And is

22   there anything else that you can remember

23   that you might have said about your

24   representation of Mr. Murphy?

1           MR. FOX:  No.

2           THE COURT:  All right.  Can you

3    just sit down for a minute, sir.  All right.

4    Is there anything that counsel want to say?

5           MR. JALELIAN:  No, thank you, Your

6    Honor.

7           THE COURT:  All right.  Do you want

8    to say anything, counsel?

9           MS. JERUCHIM:  If I could ask the

10   Court to inquire whether Mr. Fox -- and I

11   don't want to infer this, but he just stated

12   that he and Mr. Offen were best friends.

13           And I would just like the Court to

14   ask him directly if as best friends, Mr.

15   Offen has been informed or is aware, in the

16   course of their relationship, that Mr. Fox

17   is a criminal defense attorney?

18           THE COURT:  All right.  You mean,

19   did he tell him he was a criminal defense

20   attorney?

21           MS. JERUCHIM:  No.  As part of

22   the -- essentially, does Mr. Offen know or

23   is he aware, because of the nature of their

24   relationship, that Mr. Fox is a criminal

6

1    defense attorney?

2                THE COURT:  Does he know that

3          that's what you do, sir?

4                MR. FOX:  He does.  We have had

5          many discussions about my work and the

6          judicial system.

7                THE COURT:  And the reason I ask

8          you to come is because Mr. Murphy alleged

9          that you and he had a conversation a couple

10         of nights ago at which -- and I don't want

11         to misquote him, but he is claiming that you

12         admitted that you told the juror that you

13         were his attorney on similar criminal

14         matters in Suffolk Superior Court.

15               MR. FOX:  I don't think I was that

16         direct.

17               THE COURT:  All right.  Thank you,

18         sir.  Other than that, was there any

19         conversation with the juror; in other words,

20         about the case, about Mr. Murphy?

21               MR. FOX:  On the next day,

22         Saturday, I saw him again in the synagog,

23         and he said he thought he should mention it

24         to the Court, our conversation.  And I said,

7

1    "You should." And I think he said he was

2    going to call me that night to talk about

3    what he would say. And I said, "Just tell

4    the truth."

5            He then called me, and it was

6    Tuesday morning after I had the conversation

7    with Mr. Murphy, and he said that he had

8    mentioned to the Court that someone --

9            THE COURT: Because your name did

10   not come up. I didn't ask --

11           MR. FOX: I don't think my name

12   came up.

13           THE COURT: I didn't ask him, and

14   no one asked me to ask him. It didn't

15   appear relevant. But so that's all he said

16   to you?

17           MR. FOX: Yes.

18           THE COURT: All right. Can you

19   just repeat it again. He called you Tuesday

20   morning and said what?

21           MR. FOX: He said he mentioned it

22   to the Court that someone in law enforcement

23   was a friend of his and told him about Mr.

24   Murphy, and I don't remember the exact

8

1    words.  And I had asked him if he had been

2    excused, and he said that he was still on

3    the jury.

4             THE COURT:  We had a hearing, the

5    defendant did not want him excused.  And the

6    Court found, in any event, that he was fair

7    and impartial.

8             All right.  Thank you, sir.  If you

9    would just sit down for a minute.

10            All right.  Is there anything more

11   that counsel want to say?

12            MR. JALELIAN:  No, thank you, Your

13   Honor.

14            THE COURT:  Do you want to say

15   anything more, counsel?

16            MS. JERUCHIM:  In response to Mr.

17   Fox's comments?

18            THE COURT:  Just as to the issue,

19   all that is before the Court concerning the

20   juror and Mr. Fox or anything you want to

21   say concerning the situation?

22            MS. JERUCHIM:  Your Honor, I've

23   been instructed by my client again to move

24   for a mistrial.

9

1 THE COURT: On what basis?

2 MS. JERUCHIM: On the basis that

3 the information that was represented to my

4 client and I from Mr. Offen on the stand was

5 much more vague. And I didn't ask Mr. Offen

6 if he knew the individual because at least

7 from my interpretation of the conversation,

8 it didn't appear that he did. I didn't get

9 the impression that he did because if he

10 knew the person, I felt that he would have

11 told the name. And I don't say this to cast

12 any -- to cloud on Mr. Offen at all. It may

13 be that he did not know what was appropriate

14 or not and just chose to state a minimum of

15 what it was that he needed to state.

16 Nonetheless, my advice to my client

17 and certainly my client's decision not to

18 remove Mr. Offen was based upon his

19 perception that Mr. Offen was not aware that

20 the matters relative to the other court that

21 Mr. Murphy was in was on a criminal case.

22 And clearly that is not the case, Mr. Offen

23 must have known that that was the situation.

24 THE COURT: All right. Well, I

10

1    have reviewed what Mr. Offen said.  And

2    first of all, I'm going to say for the

3    record, that I find Mr. Fox to be credible,

4    and I accept what he has said to me about

5    the conversation.

6            The defendant put much more in it

7    when he spoke yesterday than either,

8    counsel, Mr. Fox or the juror had said.  And

9    I don't find that I have anything in front

10   of me which changes the situation.  He said

11   very emphatically -- and it appears on the

12   record that I'm going to make a finding, he

13   said very emphatically - and I'm talking

14   about the juror now - that he could be a

15   fair and impartial juror, that people were

16   presumed innocent.

17           So, I find that he remains fair and

18   impartial.  I find no need to question him

19   further because I don't find that anything

20   that Mr. Fox has said to me here doesn't

21   jibe with what Mr. Murphy said.  It may not

22   be all in the same words, but I don't find

23   that there is an issue.  I find that the

24   juror is fair and impartial.

11

1     And Mr. Fox, thank you for coming.

2     I appreciate it.

3     MS. JERUCHIM:  Your Honor, please

4     note my objection.

5     THE COURT:  I'll note your

6     objection.  All right.  I've got your

7     request for jury instructions, and I see

8     that you added identification.  Is there

9     anything you want to say about the jury

10     instructions other than -- and I know you've

11     asked me to read the full language of each

12     statute, I'm not going to do that.  I'm

13     going to read what appears to be relevant.

14     It would totally confuse the jury to read

15     them a long explanation in any statute.

16     As I always do, I will take out

17     what appears to be relevant.

18     MS. JERUCHIM:  Your Honor, I am

19     asking the Court -- and again, I'm going to

20     put my argument on the record, 267, Section

21     1 is very precise, not any document is

22     deemed to be --

23     THE COURT:  All right.  Let me just

24     shortcut you, counsel, because you've saved